[No. F038832. Fifth Dist. Nov. 15, 2002.]

CRAIG ALEXANDER, Plaintiff and Appellant, v.
CODEMASTERS GROUP LIMITED et al., Defendants and Respondents.

130

COUNSEL

Bacigalupi, Neufeld & Rowley and Daniel W. Rowley for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Nancy P. McClelland and Paul DeCamp for Defendants and Respondents.

OPINION

GOMES, J.—An executive appeals the grant of summary judgment in favor of his former employer in a dispute over whether the employer was contractually obligated to provide him with vested stock options. The employer contends the parties did not agree when the stock options would vest and, as a result, the purported stock options agreement was uncertain and unenforceable. On appeal, the executive claims the superior court erred in concluding as a matter of law that (1) *vesting* of the promised stock options was a material term of the agreement, (2) the agreement could not be interpreted to provide for vested stock options, and (3) the absence of an agreement concerning vesting precluded the existence of an enforceable contract and equitable estoppel.

The employer never informed the executive that the promised stock options would not be vested, but bases its interpretation of the agreement on inferences drawn from written documents, oral communications and acts of the parties that occurred over a period of several months. Obtaining summary judgment on a contract cause of action based on inferences is not easy, and in this case the employer has failed to carry its burden. We conclude triable issues of material fact exist concerning the contents of the agreement reached by the parties. Thus, summary judgment is not appropriate. We reverse the judgment and remand.

### PROCEDURAL BACKGROUND

On August 28, 2000, Craig Alexander filed a first amended complaint asserting causes of action for promissory estoppel, breach of contract, and equitable estoppel against Codemasters Group Limited, a United Kingdom company, and Codemasters Yosemite, Inc., a Delaware corporation (collectively Codemasters). Alexander's prayer for relief requested (1) $50,000 for

an unpaid performance bonus[1] and (2) stock options to purchase 35,000 shares of Codemasters' stock at an exercise price of $3.25 per share or, alternatively, monetary damages equivalent to the value of the options. Codemasters answered the first amended complaint with a general denial. The first cause of action for promissory estoppel was voluntarily dismissed by Alexander later in the proceedings.

On April 20, 2001, Codemasters filed a motion for summary judgment contending, among other things, that its purported offer to grant Alexander a performance bonus and stock options in Codemasters was too uncertain and indefinite to be enforceable. On May 7, 2001, Alexander filed his opposition papers, which included his declaration. On May 11, 2001, Codemasters filed its reply papers to Alexander's opposition to the motion for summary judgment, including evidentiary objections to various matters in 15 of the paragraphs of Alexander's declaration. The record on appeal does not contain a written response by Alexander to Codemasters' evidentiary objections.

The first hearing on the motion for summary judgment was held on May 18, 2001. As to the evidentiary objections, the superior court stated it would only consider admissible evidence. As its tentative ruling, the superior court stated it was inclined to grant summary judgment. After hearing argument, the superior court granted a continuance to allow Alexander the opportunity to take the deposition of Nick Wheelwright, managing director of Codemasters and the person with whom Alexander had negotiated the terms of his employment with Codemasters.

Mr. Wheelwright's deposition was taken on June 4, 2001. Additional briefing was filed by the parties. The continued hearing on the motion was argued on June 7, 2001. At the beginning of the hearing, the superior court stated, "I'm going to only consider relevant evidence." Counsel for Codemasters did not orally request specific rulings on the evidentiary objections and the superior court said nothing further about the evidentiary objections of Codemasters. At the conclusion of argument, the superior court said it did not think the documents and discussions rose "to the level that's necessary to have a contract," stated the motion for summary judgment would be granted, and directed counsel for Codemasters to prepare the order.

Judgment was entered in favor of Codemasters on July 3, 2001. A nine-page order granting the motion for summary judgment was signed and entered by the superior court on July 5, 2001. Alexander filed a timely notice

[1]Alexander's opposition to the motion for summary judgment conceded that the terms under which the $50,000 performance bonus would be earned were not sufficiently clear to be enforced.

of appeal stating he "appeals from the Judgement by Court Under CCP § 437c entered on July 3, 2001." Alexander's notice of appeal and appellate briefs do not directly challenge any purported evidentiary rulings of the superior court.

FACTS

Between February 1995 and June 1999, Alexander was employed in Oakhurst, California as the general manager of Yosemite Entertainment, a division of the computer game company Sierra On-Line. In early 1999, Sierra On-Line announced its intentions to close the Oakhurst facility and reduce its workforce.

Alexander attempted to find a company willing to purchase the assets of the business that Sierra On-Line was closing, hire him to manage the business, and employ the other workers who were being laid off. Codemasters was one of the computer game companies contacted by Alexander and it became interested in the acquisition.

After Codemasters decided to acquire the assets from Sierra On-Line, negotiations regarding Alexander's employment began. Mr. Wheelwright asked Alexander to provide him with information about Alexander's compensation package with Sierra On-Line, details of other offers Alexander had received, and the compensation Alexander wanted. On June 8, 1999, Alexander sent Mr. Wheelwright an e-mail responding to his request. The e-mail listed Alexander's "current target yearly compensation" with Sierra at $250,000 based on salary, bonus and stock options. The e-mail also listed other offers for (1) $260,000 plus 15,000 stock options and (2) $190,000 plus 150,000 stock options and stated the options in both offers vested over five years.

Following the June 8, 1999, e-mail, Alexander went to the United Kingdom and discussed with Codemasters the acquisition of the assets of Sierra On-Line and his possible employment with Codemasters. The July 5, 2001, order ruled the description of this meeting contained in the second sentence of paragraph 9 of Alexander's declaration was inadmissible.

At some point in early to mid-1999, three representatives of Codemasters held a meeting in a rented movie theater in Oakhurst with employees of Sierra On-Line. This meeting was the first discussion anyone from Codemasters had with Alexander regarding employee stock or options or equity should Codemasters commence business operations in the United States. At this meeting, nothing specific was said regarding the details of a stock option

plan, other than that providing the prospective United States employees something that they had before was a goal. Not all of the prospective employees had been eligible for options with Sierra On-Line.

On June 16, 1999, Alexander became an employee of Codemasters assigned to the Oakhurst facility. On July 8, 1999, Alexander signed a document dated June 24, 1999, and titled "Offer to Craig Alexander" (Letter Agreement) that was sent to him by Nick Wheelwright. The Letter Agreement stated in part:

"1. Your appointment as a senior executive with Codemasters Software Company Limited. (Full title to be decided later) with effect from 16th June 1999. [¶] . . . [¶]

"9. We intend to grant you share options provided we are advised that this is feasible and appropriate. If we do not do this we will review your overall package and bonus structure to compensate for this.

"As an employee of Codemasters, you agree that you will sign a Contract of Employment, which will be prepared upon receipt of your acceptance. We will also require you to sign a Non-Disclosure Agreement upon acceptance of this offer. [¶] . . . [¶]

"I accept the offer of employment with the above terms and conditions"

In paragraph 10 of his declaration, Alexander claims he signed the Letter Agreement in reliance upon Mr. Wheelwright's promise that the stock options he was to receive would be as good or better than the ones he received from Sierra On-Line.

In mid-1999, a few weeks after Alexander was hired but before any other employees were hired at the Oakhurst facility by Codemasters, Alexander had a meeting in Oakhurst with two representatives of Codemasters' United Kingdom head office operations, finance director Sarah Gosbell and Mr. Wheelwright.

During the initial discussion about the potential stock option plan for United States employees, Mr. Wheelwright proposed a two-and-a-half-year period for "vesting"[2] of the options granted under that plan. Subsequently, probably after the meeting, Alexander informed Codemasters that the options granted by Sierra On-Line had a five-year vesting schedule.

---

[2]Alexander contends Codemasters' British executives used the word "vested" to mean "exercisable."

During the meeting, Alexander discussed with Ms. Gosbell and Mr. Wheelwright the issue of vesting of options in the event of termination of employment by a United States employee. Alexander asked what would happen to any options awarded to a United States employee whose employment with Codemasters terminated. The discussion ended with no resolution of that question and with Alexander acknowledging that "we just need to work the details out."

Alexander contends the discussions concerning the vesting of options in the event of termination concerned the stock option plan for other United States employees and did not concern his options. The parties do not dispute that they never agreed on the particular plan under which Alexander's stock options would be granted.

Alexander's stock options were addressed at the meeting when Mr. Wheelwright handed Alexander a document titled "US SHARE SCHEME." Across from Alexander's name, the column titled "Options Value" contained a typewritten "$100,000" through which Mr. Wheelwright had drawn a line and handwritten "$150" immediately to the right.

On October 5, 1999, Alexander sent Ms. Gosbell an e-mail proposing that options granted under the United States stock option plan become fully vested and exercisable upon termination without cause of the employee. Ms. Gosbell never agreed orally or in writing to this proposal.

In March 2000, Alexander and employees at the Oakhurst facility who worked on stand-alone, as opposed to online, games were laid off when Codemasters decided to discontinue producing stand-alone games at the Oakhurst facility. Prior to his termination, Alexander was never told by anyone at Codemasters that there were any terms regarding his stock options that were in dispute, needed to be resolved, or were left for future agreement. In his exit interview, Alexander asked to receive his stock options and was told that he would not receive any.

Neither the contract of employment nor the nondisclosure agreement mentioned in the Letter Agreement was entered by the parties before Alexander was told he was laid off.

On May 17, 2000, Codemasters adopted a United States stock option plan which provided the options granted thereunder could be exercised as to 20 percent of the shares on the first anniversary of the grant and as to an additional 20 percent on each of the next four anniversaries of the grant.

## DISCUSSION

Alexander's breach of contract cause of action in his first amended complaint alleges Alexander and Codemasters entered into a written agreement that was later supplemented by oral agreements. The first amended complaint sets forth the language from the above quoted paragraph 9 of the Letter Agreement and further alleges: "28. In addition to the written agreement, Alexander and Codemasters subsequently orally agreed to the details of the stock options he would be offered, including but not limited to, Alexander being provided with stock options for 35,000 shares of stock in Codemasters, a purchase price of $3.25 per share and the automatic vesting of the stock options in the event of termination of employment without cause."

Alexander later retreated from the allegation of automatic vesting at termination. His opposition to the motion for summary judgment filed May 7, 2001, states the automatic vesting was an issue he was working on for the United States stock option plan *for the other employees*, the plan did not apply to him, and automatic vesting was not a term of his agreement. Alexander describes the allegation of vesting upon termination as a pleading error.

In its merged separate statements filed May 11, 2001, Codemasters acknowledges Alexander's position that the options allegedly owed to him were not subject to vesting on termination. Similarly, the superior court appeared to accept Alexander's claim of pleading error because its analysis was not limited to a contract that purported to provide for vesting upon termination. We adopt a similar approach towards Alexander's breach of contract claim.

Alexander's contention that the options were not subject to vesting upon termination is logically consistent with two conflicting positions. Codemasters' position is that Alexander's stock options were not vested at the beginning of the purported contract, and never became vested, by virtue of his termination or otherwise. In contrast, Alexander's position is that his options did not vest when his employment ended because they were, in effect, already vested, i.e., were not subject to any express or implied conditions precedent at the time of the agreement.

Alexander claims the superior court erred when it found, as a matter of law, that (1) a vesting schedule for the stock options was a material term in the contract between Alexander and Codemasters and (2) the parties did not reach an agreement on the question of vesting. Alexander also claims the

conclusion that the absence of an agreement on vesting precludes the existence of an enforceable contract or equitable estoppel is erroneous.

## I. Standard of Review

### A. Summary Judgment

The standards applicable to appellate court review of a motion for summary judgment are well established. (See Code Civ. Proc., § 437c; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) ■ We determine de novo whether a triable issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

In reviewing a motion for summary judgment, we must consider all of the evidence and all of the inferences reasonably drawn therefrom, and we must view such evidence in the light most favorable to the opposing party. (*Aguilar, supra*, 25 Cal.4th at p. 843.) A defendant moving for summary judgment must "present evidence that would require . . . a trier of fact *not* to find any underlying material fact more likely than not." (*Id.* at p. 845.)

A *triable* issue of fact exists when the evidence reasonably permits the trier of fact, under the applicable standard of proof, to find the purportedly contested fact in favor of the party opposing the motion. (*Aguilar, supra*, 25 Cal.4th at p. 850.)

■ This appeal requires a disciplined analysis of what inferences may be drawn from the admissible evidence. A material issue of fact may not be resolved based on inferences, if contradicted by other inferences or evidence. (Code Civ. Proc., § 437c, subd. (c); *Aguilar, supra*, 25 Cal.4th at p. 856.) "[T]he court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact," but must determine the question of law of "what any evidence or inference *could show or imply to a reasonable trier of fact.*" (*Aguilar*, at p. 856.) Where the evidence and inferences would allow a reasonable trier of fact to find the underlying fact in favor of a plaintiff in accordance with the applicable standard of proof, then a defendant's motion for summary judgment must be denied. (*Id.* at p. 850.)

### B. Evidence Considered on Appeal

■ First, for purposes of reviewing a motion for summary judgment, we do not consider evidence "to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100

Cal.Rptr.2d 352, 8 P.3d 1089].) Where a plaintiff does not challenge the superior court's ruling sustaining a moving defendant's objections to evidence offered in opposition to the summary judgment motion, "any issues concerning the correctness of the trial court's evidentiary rulings have been waived. [Citations.] We therefore consider all such evidence to have been 'properly excluded.' [Citation.]" (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014-1015 [120 Cal.Rptr.2d 281].)[3]

Second, where no objection was made, the evidence is admitted and therefore is part of the record an appellate court must consider. (*Haskell v. Carli* (1987) 195 Cal.App.3d 124, 129-130 [240 Cal.Rptr. 439].) It is well settled that the failure to object, even to otherwise inadmissible evidence, waives the defect. (Evid. Code, § 353, subd. (a) [to preserve the right to challenge erroneously received evidence, litigant must make a timely objection]; Code Civ. Proc., § 437c, subd. (b) [evidentiary objections not made at summary judgment hearing shall be deemed waived].)

Third, where evidentiary objections were filed in the superior court, but the record contains no rulings on those objections, the objections are waived and the objected-to evidence is considered as having been admitted in evidence as part of the record for purposes of the appeal. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207]; Code Civ. Proc., § 437c, subds. (b), (c); see *City of Long Beach v. Farmers & Merchants Bank of Long Beach* (2000) 81 Cal.App.4th 780 [97 Cal.Rptr.2d 140] [exception to waiver rule where further attempts by attorney to obtain rulings would be fruitless].)

Fourth, when a superior court states that it considered only admissible evidence, we do not view such a statement as an implied ruling sustaining evidentiary objections, but as "an implied overruling of any objection not specifically sustained." (*Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 736 [80 Cal.Rptr.2d 454]; see *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 234-238 [114 Cal.Rptr.2d 151]; but see *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1419 [267 Cal.Rptr. 819].)

In accordance with the rule set forth in *Laird*, the question before us is whether any of Codemasters' objections were "specifically sustained." The superior court's oral statements that it would consider only admissible or relevant evidence as well as the statement in the July 5, 2001, order that it

---

[3]When a superior court's rulings on evidentiary objections are challenged on appeal, an abuse of discretion standard is applied. (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169 [121 Cal.Rptr.2d 79].)

considered "only the evidence that was admissible" impliedly overruled Codemasters' 15 evidentiary objections except to the extent that those objections were *specifically sustained* elsewhere in the court's written order.

## II. *Formation of a Contract Requires Certainty*

Mutual assent or consent is necessary to the formation of a contract. (Civ. Code, §§ 1550, 1565.) ■ Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 119, p. 144.) Mutual assent is a question of fact. (See BAJI No. 10.60.)

The manifestation of mutual assent often is achieved through the process of offer and acceptance. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 128, p. 153.) To form a contract, an "offer must be sufficiently definite . . . that the performance promised is reasonably certain. [Citations.]" (1 Witkin, *supra*, § 145, p. 169; BAJI No. 10.65.) The phrase "reasonably certain" means the terms "provide a basis for determining the existence of a breach and for giving an appropriate remedy." (Rest.2d Contracts, § 33, subd. (2).) This definition of the requirement of certainty has been described as involving two questions: "[F]irst, did the parties intend to contract and second, is there a reasonably certain basis for giving an appropriate remedy." (1 Williston on Contracts (4th ed. 1990) § 4:18, p. 425, fn. omitted.)

■ " '[W]hether a certain or undisputed state of facts establishes a contract is one of law for the court . . . . On the other hand, where the existence and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury or other trier of the facts to determine whether the contract did in fact exist, . . .' [Citation.]" (*Robinson & Wilson, Inc. v. Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675] [provision, as interpreted, was not enforceable because it was indefinite and uncertain as to scope of the work contemplated in undesigned portions of the building and thus did not provide a proper basis for measuring damages for breach].)

■ In the present case, the parties dispute the existence of a contract to grant stock options. Therefore, in reviewing Codemasters' motion for summary judgment, we must determine whether " 'the evidence is conflicting or admits of more than one inference' " (*Robinson & Wilson, Inc. v. Stone, supra,* 35 Cal.App.3d at p. 407) with respect to whether or not an agreement

existed and, if so, the contents of that agreement between Alexander and Codemasters.

If there is a conflict in the evidence and inferences drawn from that evidence, then we must view that evidence and inferences in the light most favorable to Alexander. Once the existence and contents of the agreement are determined based on that view, then we can address the legal question of whether that agreement is sufficiently definite and certain to be enforced.

Before proceeding with our analysis of the factual and legal issues raised by the requirement for certainty, we express our reluctance to use a single word such as "material" or "essential" because use of a single word may blur the distinction between the factual and legal aspects of the requirement for certainty in a contract.

For example, courts in some jurisdictions describe the issue of what is a material or essential term as one mainly of fact. (*Roussalis v. Wyoming Medical Center, Inc.* (Wyo. 2000) 4 P.3d 209, 232 [" 'what is an essential term is often a question of fact involving a determination of each party's intent to be bound, and thus must frequently be decided by a jury' "]; *Pantzer v. Shields Development Co.* (D.Del. 1986) 660 F.Supp. 56, 60 [same, applying Delaware law].) Others describe it as one of law. (*Dante v. Golas* (1992) 121 Idaho 149, 152 [823 P.2d 183, 186 ["The question whether an agreement is complete in all of its material terms is a question of law"].)

Other courts that use the word "material" or "essential" adopt language that is more explicit in recognizing that the requirement for certainty has both a factual and a legal component. (*Ronin v. Lerner* (Tex.Ct.App. 1999) 7 S.W.3d 883, 888 ["whether a settlement agreement fails for lack of an essential term is a question of law to be determined by the court, unless there is ambiguity or unless surrounding facts and circumstances demonstrate a factual issue as to an agreement"].) Colorado Jury Instructions, Civil 30:7 (4th ed. 2001) asks the jury whether the "essential terms of a contract [are] sufficiently definite and complete to permit the parties to know and understand their rights and duties under the claimed contract." In contrast, "[t]he question of whether or not an alleged contract is sufficiently definite in its terms to be *judicially enforceable* is normally a question to be determined by the court." (*Id.*, Notes on Use, italics added.) Finally, even when courts do not use the word "material" or "essential" in describing the requirement for certainty, they sometimes use language that does not distinguish between the factual and the legal aspects of that requirement. (Compare *Augeri v. C.F. Wooding Co.* (1977) 173 Conn. 426, 429-430 [378 A.2d 538, 540], overruled on other grounds by *Santopietro v. New Haven* (1996) 239 Conn. 207 [682

A.2d 106 [whether a contract was "too indefinite to be enforceable" was a question of fact], with *Castroville Airport, Inc. v. City of Castroville* (Tex.Ct.App. 1998) 974 S.W.2d 207, 211 [whether an agreement fails for indefiniteness is a question of law].)

A. *The Parties' Manifestation of Mutual Assent Presents Questions of Fact*

 The dispute over the agreement to grant Alexander stock options concerns the details of that agreement, particularly the conditions, if any, for the vesting of the stock options. The evidence does not establish an *explicit* understanding between Codemasters and Alexander that (1) Alexander's stock options were unvested until the occurrence of particular conditions for vesting, (2) conditions for vesting of Alexander's stock options would be agreed upon at a later time, or (3) more generally, the agreement to grant Alexander stock options was not binding until further agreements were made. Consequently, the scope of the parties' manifestation of mutual assent on the topic of conditions for vesting must be inferred from their words and acts.

Before analyzing the inferences that may be made from the evidence, we set forth five relevant factual scenarios that might have occurred regarding the parties' manifestation of mutual assent on whether conditions for vesting would be imposed upon Alexander's stock options. Identifying these five possibilities is useful in determining whether or not the inferences indisputably establish one particular scenario over the other four.

In the first scenario, the parties did not consider the issue of vesting and, therefore, the matters on which they agreed[4] were silent about conditions for vesting. In the second scenario, the parties considered the issue and agreed that they would agree later on whether or not to include any conditions for vesting and, as a result of postponing the issue, understood their agreement was not yet complete until they reached agreement on the issue. In the third scenario, the facts are the same as the second scenario except that the parties understood the agreement was complete.[5] In the fourth scenario, the parties considered the issue and agreed that no conditions for vesting would be imposed on Alexander's ownership of the stock options. In the fifth scenario, the parties considered the issue and agreed that conditions for vesting would be imposed on Alexander's ownership of the stock options.

---

[4] In this context, the word "agreed" is used to mean manifested mutual assent.

[5] The importance of the parties' understanding as to completeness is illustrated in BAJI No. 10.66, which provides in part, "Where any of the essential terms of an apparent agreement are left for future determination and it is understood by the parties that the agreement is not complete until they are settled, . . . no contract results until this is done." Unfortunately, BAJI No. 10.66 and the other jury instructions do not explicitly tell jurors how to determine what is an essential term.

1. *Inferences from Codemasters' Silence and Lack of Promises Are Not Indisputable*

Codemasters' separate statement establishes that Codemasters did not tell or promise certain things to Alexander. For instance, Codemasters did not tell Alexander that it had been advised that granting stock options to United States employees was not feasible or appropriate. Also, Codemasters did not promise Alexander that (1) he would be granted stock options in Codemasters that would vest fully and automatically upon the termination of his employment, (2) he would be granted stock options in Codemasters in the event his employment with Codemasters terminated before its board of directors approved and adopted a stock option plan applicable to him and under which he would be granted options, and (3) any stock option plan for United States employees, including Alexander, would be adopted by Codemasters' board of directors before March 7, 2000, or any other specific date.

It appears Codemasters included the fact that Codemasters did not tell Alexander that it had been advised that granting stock options to United States employees was not feasible or appropriate to show how the parties implemented part of the Letter Agreement. The first sentence of paragraph 9 of the Letter Agreement said, "We intend to grant you share options provided we are advised that this is feasible and appropriate." Although Codemasters is unclear about what inferences may be drawn from what it did not tell Alexander, one possible inference is that Codemasters actually received advice regarding either the United States stock option plan or Alexander's stock options and did not tell Alexander about it. Another possible inference is that Codemasters never sought or received advice regarding Alexander's stock options. In any event, Codemasters' silence about what advice it received does not indisputably lead to the inference that Alexander and Codemasters never reached agreement about whether any conditions for vesting would be imposed upon Alexander's stock options. A reasonable person in Alexander's position could view such silence as consistent with Codemasters having found a way to issue Alexander stock options that were not subject to conditions for vesting.

The lack of explicit promises by Codemasters to grant Alexander options that vested upon termination of his employment, to grant Alexander options even if he was terminated before the board of directors approved a stock option plan under which he would be granted options, and to grant options before a particular date may lead to a number of inferences. While the lack of promises may show that the parties did not agree to what conditions for vesting, if any, would be imposed upon Alexander's stock options, a reasonable trier of fact could infer that the silence on such matter meant the

agreement of the parties was complete without any conditions for vesting, particularly in light of the extensive discussions about the vesting provisions for the proposed United States stock option plan. Furthermore, even if there were no agreement on what conditions for vesting would be imposed, it does not indisputably follow that "it [was] understood by the parties that the agreement [was] not complete until [the conditions for vesting were] settled . . . ." (BAJI No. 10.66.) A reasonable trier of fact could find that the parties understood their agreement was complete (the third scenario described above, rather than the second) and could make this finding based in part on an inference drawn from the fact that Codemasters never informed Alexander before his termination that (1) any terms regarding his stock options were in dispute, needed to be resolved, or were left for future agreement or (2) his stock options were unvested until the occurrence of particular conditions.

### 2. Inferences Drawn from the Terms and Conditions of Codemasters' United States Stock Option Plan Are Not Indisputable

Codemasters attempts to support its inferences regarding the contents of the parties' agreement with details about the negotiations concerning Codemasters' stock option plan for United States employees. Similarly, the form of order prepared by Codemasters' counsel and adopted by the superior court sets forth findings of fact relating to that stock option plan.

However, the terms and conditions of the United States stock option plan do not apply to Alexander's stock options because there was never any agreement that his stock options would be issued under that plan. Indeed, based on fact No. 50 of Codemasters' separate statement, the superior court found that there was never any certainty whether Alexander's grant of stock options would be issued through the plan being developed for other United States employees or through a discretionary stock option plan that applied to Mr. Wheelwright, Ms. Gosbell and other senior managers of Codemasters Group Limited, or whether a separate plan would be prepared for Alexander alone.

Although Codemasters does not explicitly make the argument, it could be implying that (1) the negotiations regarding the conditions for vesting of the options granted under Codemasters' United States stock option plan created the inference that conditions for vesting were very important to *any* option agreement entered into by Codemasters and (2) both Codemasters and Alexander understood this inference and from it they implicitly understood that their agreement was not binding until they reached an explicit agreement on the conditions for vesting of Alexander's options.

Codemasters also might be inferring that because the United States stock option plan was not completed until after Alexander's termination, and because the parties never agreed on the stock option plan under which Alexander's stock options would be issued, the parties did not incorporate a particular plan's provisions on conditions for vesting into their agreement concerning Alexander's stock options and, therefore the conditions for vesting were unresolved. These inferences do not address the more fundamental question of whether *any* conditions for vesting would be imposed upon Alexander's stock options.

While a reasonable trier of fact could make the foregoing inferences, those inferences are not indisputable. The trier of fact also could infer that, in the context of all their other communications and actions, the failure to specifically discuss the conditions for vesting to be imposed on Alexander's stock option meant the parties agreed that there would be no conditions for vesting or that they agreed they would be bound without agreeing to conditions for vesting.

### 3. *Lack of Board Approval Does Not Make the Agreement Unenforceable*

Codemasters' separate statement provides that Alexander understood that for any company, including Codemasters, to issue equity, including stock options, its board of directors must take action to approve the issuance. From this understanding, Codemasters apparently infers that the parties did not intend to be bound until the board of directors approved the terms of their agreement.

One weakness in Codemasters' theory is its failure to include anything in its separate statement to establish that its managing director did not have the actual or ostensible authority to enter into a binding contract with a potential employee without board approval.[6] Also, if Codemasters infers that the parties understood that the agreement regarding stock options was subject to a contingency because Alexander was aware that the board of directors might not approve, might delay approval, or might impose additional conditions on the grant of options to Alexander, it does not necessarily follow that approval by the board of directors was understood to be a condition to the enforceability of the agreement. The uncertainty could have been over

---

[6]Arguing that Wheelwright did not have the authority to bind the corporation may be difficult for Codemasters because it accepted the benefits of the contract, i.e., the services of Alexander, and, therefore, may be estopped from denying that Wheelwright had the authority to offer Alexander stock options to induce him to accept employment. (See *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 779-780 [98 Cal.Rptr.2d 1, 3 P.3d 286].)

whether the board would choose to honor the contract made by its officer or, alternatively, choose to breach the contract by failing to take the steps needed to implement the contract. (See *Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 544-545 [54 Cal.Rptr.2d 128] [provisions indispensable to effectuate the intention of the parties will be implied]; Civ. Code, § 1656.)

To the extent that Codemasters may be interpreting the phrase "feasible and appropriate" contained in the Letter Agreement to allow the board of directors to impose previously unstated conditions or restrictions upon the stock options granted to Alexander, Codemasters' separate statement does not establish what the parties meant by that phrase. Rather, that phrase appears ambiguous on the record before us and, as such, presents a question to be resolved by the trier of fact. ■ Generally, if the terms of a contract are ambiguous, determining the contract's terms is a question of fact for the trier of fact, based on "all credible evidence concerning the parties' intentions . . . ." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].)

### 4. Summary Concerning Issues of Fact

■ In summary, Codemasters never directly told Alexander, orally or in writing, that the proposed stock options were not vested. Our analysis of the inferences that could be drawn from the evidence shows that Codemasters failed to carry the burden of producing evidence from which it could be indisputably inferred that (1) the parties agreed the stock options were to be subject to conditions for vesting or (2) the agreement was not binding until further agreements were made. The existence of an agreement with respect to the conditions for vesting, if any, to be imposed on Alexander's stock options involves factual questions that cannot be determined as a matter of law because of the conflicting inferences that may be drawn from the words and acts of the parties. Therefore, the finding as a matter of law that "[d]uring the negotiations regarding [Alexander's] compensation, [Alexander] and Codemasters never reached agreement regarding when any stock options . . . would vest" is erroneous.

On remand, the trier of fact should address whether the agreement concerning the stock options embodies the requisite certainty by determining (1) whether there was a manifestation of mutual assent by the parties to be bound, i.e., to conclude a contract, and (2) whether the terms were sufficiently definite that the performance promised was reasonably certain of definition. (See BAJI No. 10.65.) We observe, as in the first, third and fourth factual scenarios previously described, that it is possible the parties manifested a mutual assent to be bound by an agreement that did not include any conditions for vesting.

### B. *The Legal Question of Sufficient Certainty*

Notwithstanding the determination that facts relied upon by Codemasters are in dispute, we address the legal question of whether there is sufficient certainty to judicially enforce the agreement. This decision to proceed to the legal question can be stated in the abstract as follows. When a moving party bases a motion for summary judgment on facts A through M and a court determines that only facts A through F are undisputed, the superior court still faces the question of whether or not facts A through F present a sufficient basis for granting summary judgment. In other words, the court must decide whether facts G through M were "material"[7] to the grant of summary judgment.

Because of the factual questions about the existence of an agreement on conditions for vesting and the requirement that the evidence be viewed in the light most favorable to Alexander, we consider whether the fourth factual scenario meets the minimum level of certainty necessary for judicial enforcement. Under the fourth scenario, the parties manifested a mutual assent that there would be no conditions on vesting of the stock options. ▮ The narrowness of the legal issue we address here is illustrated when it is restated as: Is an agreement by an employer and an employee for an award of stock options that are fully vested upon issuance[8] judicially enforceable?

There is no doubt that courts are capable of enforcing an option agreement that does not contain conditions for vesting, whether the asset purchased is shares of stock or something else. The lack of conditions for vesting, or any other condition precedent, does not by its nature render an option agreement so uncertain and incomplete that a court cannot enforce it, i.e., determine that it has been breached and grant relief. (See 3 Corbin on Contracts (rev. ed. 1996) § 11.8, pp. 534-535 [discussion of option contracts subject to conditions precedent].) In other words, conditions for vesting are not the terms that provide a rational basis for the assessment of damages. (See *Robinson & Wilson, Inc. v. Stone, supra*, 35 Cal.App.3d at p. 407.) By comparison, there is no rational basis for providing a remedy when a construction company does not complete a portion of a building for which there are no design plans. (*Ibid.*) Also, a loan commitment letter that does not identify the borrower, the amount of the loan, or the terms of repayment does not provide a rational basis for providing a remedy. (*Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 115 [284

---

[7]Here we use the term "material" in the sense that it is used in Code of Civil Procedure section 437c.

[8]Describing the stock options as fully vested upon issuance is simply another way of saying the options are not subject to any conditions for vesting.

Cal.Rptr. 367] [summary judgment for defendant lender upheld; letter was too uncertain to be judicially enforced as a contract].) In addition, if the first, second or fourth factual scenario is proven, allowing Alexander to recover damages would not frustrate either the legitimate expectations or reliance interests of either of the parties. (See generally Wonnell, *Expectation, Reliance, and the Two Contractual Wrongs* (2001) 38 San Diego L.Rev. 53.) Therefore, Codemasters is not entitled to summary judgment on the ground that an option agreement without conditions for vesting is so uncertain and indefinite that a court could not provide a remedy.

### C. *Ekedahl Is Factually Distinguishable from This Appeal*

Both parties have cited *Ekedahl v. COREStaff, Inc.* (D.C. Cir. 1999) 183 F.3d 855 (*Ekedahl*), where the court overturned a jury's verdict and held that the vesting of the employee stock options was a material term of the putative options contract and, therefore, there was no enforceable contract between the parties for the grant of stock options. We conclude that the facts in *Ekedahl* are distinguishable from the present case and, therefore, the legal conclusion that the agreement between Alexander and Codemasters also is too uncertain to enforce is not appropriate on the record before us.

First, in *Ekedahl*, there was no evidence that the defendant knew of the plaintiff's compensation from her previous employer. Thus, the jury had no basis for inferring that immediate vesting was necessary to make the compensation offered by the defendant worth more than her prior compensation. (*Ekedahl, supra*, 183 F.3d at p. 859.) In this case, evidence is available regarding Alexander's compensation with Sierra On-Line, the terms of other employment offers to Alexander, and the role that stock options played in each compensation package. In addition, paragraph 10 of Alexander's declaration states that he signed the Letter Agreement in reliance upon Mr. Wheelwright's promise that the stock options he was to receive would be as good or better than the ones he received from Sierra On-Line. Consequently, a reasonable trier of fact could infer that Alexander's compensation for the first year of his employment with Codemasters required that he receive options that were not subject to conditions for vesting in order to be comparable to his prior compensation or the compensation contained in other offers.

Second, Alexander and Codemasters discussed vesting of the options in the United States stock option plan over a significant period of time while the plaintiff and defendant in *Ekedahl* did not discuss vesting at all before the controversy regarding vesting began. What inferences are drawn from the parties' silence about imposing conditions for vesting on Alexander's

stock options while discussing vesting in detail with respect to the United States stock option plan is a question for the trier of fact, particularly when these inferences should be drawn with reference to the circumstances under which the agreement was made. (See Civ. Code, § 1647.)

In addition, the result in *Ekedahl* may have been different under California law. The court reached its conclusion that vesting was a "material" term based on (1) the plaintiff's testimony that she would not have left her earlier job for employment with the defendant unless the stock options vested immediately and (2) testimony of the defendant's witnesses that vesting was an integral part of its stock option plan and it *generally* did not offer immediately vesting options. (*Ekedahl, supra,* 183 F.3d at p. 858.) However, the court did not indicate whether either party communicated its outlook to the other. General counsel for the defendant testified that the plaintiff should have known there would be vesting restrictions, but no explanation of how the plaintiff should have obtained this knowledge was set forth in the opinion. (*Id.* at p. 857.) Thus, the court may have reached its conclusion based on the subjective beliefs of the parties. Under California law, the subjective, unexpressed beliefs of the parties do not serve as the basis for whether or not a contract is formed. Instead, the mutual assent necessary to form a contract is determined under an objective standard applied to the outward manifestations or expressions of the parties. (1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 119, p. 144.)

Accordingly, the result in *Ekedahl* does not support a holding that Codemasters is entitled to summary judgment in this case.

### DISPOSITION

Judgment is reversed. The superior court is directed to vacate the July 5, 2001, order regarding Codemasters' motion for summary judgment or, in the alternative, summary adjudication, and to enter an order denying the motion for summary judgment and granting the motion for summary adjudication only as to Alexander's claim regarding a $50,000 performance bonus. Appellant is awarded costs on appeal.

Ardaiz, P. J., and Cornell, J., concurred.

A petition for a rehearing was denied December 13, 2002, and the opinion was modified to read as printed above.