Filed 2/26/24  Wertheim, LLC v. Omidvar CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WERTHEIM, LLC,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>O'NEIL OMIDVAR, et al.,<br><br>　　　Defendants and Respondents. | B323036<br><br>(Los Angeles County<br>Super. Ct. Nos. BC395819,<br>BC598307) |

　　　APPEAL from an order of the Superior Court of Los Angeles County, David Sotelo, Judge.  Reversed.

　　　Henry J. Josefsberg for Plaintiff and Appellant.

　　　Complex Appellate Litigation Group, Jens B. Koepke, Jennifer A. Teaford for Defendants and Respondents.

————————————————————

Wertheim, LLC sued O'Neil Omidvar for interference with assignment agreements Wertheim made with a third party in 2006 and 2009.  In an appeal on a related case, we observed that although the issue was not before us, both Wertheim and Omidvar essentially admitted in litigation that they acted unconscionably toward the third party.  Based on this observation, the trial court granted Omidvar summary judgment, finding no triable issue existed as to whether the assignment agreements were unconscionable.

We reverse.  In the related appeal we did not decide any unconscionability issue.

## BACKGROUND

### A.     Introduction

We take the facts from plaintiff's allegations in this litigation and from evidence presented in prior appeals, reciting them here only for context.  Because this appeal comes to us after summary judgment, there have been no factual findings.

Plaintiff Wertheim alleges that defendants O'Neil Omidvar and his relatives, Parviz and Oliver Omidvar, and their companies, Currency Corporation, Tiffany Ventures, LLC, Entertainment Factors, LLC, and Music Royalty Consulting, Inc. (collectively Omidvar), lent money at high interest rates to elderly artists who owned royalty rights.[1]  In exchange, the artists assigned their royalties to Omidvar.

---

[1] In prior appeals we referred to Omidvar-aligned defendants collectively as "Currency."  In this appeal we refer to them collectively as "Omidvar" to synergize with the pleadings. Although not all defendants have always appeared in the various cases between these parties, for present purposes "Omidvar" and "Currency" are interchangeable.

Maibell Page, 1941-2012, was the widow of Eugene Page, a highly successful songwriter, arranger and producer who died in 1998.

In *Currency Corp. v. Wertheim* (Sept. 30, 2013, B240444) [nonpub. opn.] (*Currency 2013*), we noted that in earlier proceedings, Page's daughter testified that Page was a preschool teacher until 2005, when she suffered a debilitating stroke. After her stroke, Page stopped working and for a time was incapable of managing her financial affairs. She resided in an assisted living community and received Social Security as her primary source of income. Page received periodic royalty payments from two music rights management companies, the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI). ASCAP, for example, generally made payments 30 times per year. The revenue stream from Page's royalties amounted to approximately $50,000 per year.[2]

David Pullman was the principal of Wertheim, Structured Asset Sales, LLC, and the Pullman Group, LLC (collectively Wertheim). Pullman has negotiated with several of Omidvar's borrowers, including Page, for assignment of their claims against Omidvar and reassignment of their music catalogs to Wertheim.

This litigation concerns a loan Omidvar made to Page on June 2, 2006, and an assignment Page made to Wertheim four weeks later, on June 30, 2006, granting him the right to pursue her claims against Omidvar regarding the June 2 loan.

In prior litigation, Wertheim argued that Omidvar's June 2 loan agreement was unconscionable because Page was

_____

[2] We relate Page's circumstances only for context. No factual findings have ever been made as to them.

incompetent when she entered into it. In a prior appeal, we observed that this argument applied with equal force to Wertheim's June 30 assignment agreement.

## B. Loans and Assignments

Wertheim alleges that Omidvar made numerous loans to Page, each secured by a promissory note pursuant to which Page assigned to Omidvar the royalty rights she derived from her husband's work.[3]

As an example, Wertheim alleged that on June 2, 2006, Omidvar lent Page $6,500, secured by a promissory note (the June 2006 Note), for a period of six months at an interest rate of two percent compounded every 10 days, plus an administrative fee of 10 percent, for an effective annual interest rate of approximately 107 percent. The note also provided that Page assigned her royalty rights to Omidvar. Pursuant to this provision, Page directed ASCAP to make royalty payments directly to Omidvar.

### 1. 2006 Assignment—Page Assigns Royalties to Wertheim

On June 30, 2006, four weeks after the June 2, 2006 Note, Page, now dissatisfied with her arrangement with Omidvar, assigned any causes of action she might have against Omidvar to Wertheim, and reassigned to Wertheim the same royalty rights she had already assigned to Omidvar (2006 Assignment).

---

[3] Defendants contend Parviz, Oliver and O'Neil Omidvar, as well as Music Royalty Consulting, Inc. and Entertainment Factors, LLC, did no business with Page.

**2. Our Prior Characterization of Omidvar's and Wertheim's Dealings with Page up to 2006**

In *Currency 2013*, *supra,* B240444, we observed that the June 6 Note between Omidvar and Page, and the 2006 Assignment between Wertheim and Page, were both unconscionable. We stated:

"[W]e feel constrained to make an observation about this litigation that may save time for all parties and the court below. Both sides urge us to accept and enforce provisions from various agreements between them and Maibell. . . . Yet both sides [i.e., the Omidvar and Wertheim Parties] have admitted to conduct that amounts to breach of fiduciary duty and financial elder abuse. Indeed, this entire litigation . . . surrounds a three-sided effort to separate Maibell Page, an ill, incompetent senior, from her main source of income. Currency [equating here with Omidvar] admitted during the arbitration hearing that it extended loans to Maibell after she suffered a stroke and became unable to understand the loan terms, failed and was unable to account for the money it took from her, and retained her money without just cause. (It offered to return the money at the hearing.) Christopher Page [Maibell's son] admitted he took Maibell's money for his own and his sister's uses, knowing Maibell was unable to understand the transactions. And Wertheim admitted it extracted financial agreements from 'an unsuspecting elderly widow with short term memory loss, who had been institutionalized for mental illness.' And all of the agreements were unconscionable. All were written in visually dense incomprehensible language, heavily favored their authors, and were obtained under conditions of undue influence. Currency made purportedly commercial 'loans' to Maibell—some

5

for under $100—at 107 percent annual interest—charged at its own undisclosed discretion—while keeping no records.  Wertheim bought a royalty stream from her, worth approximately $50,000 per year, for $1,000."

However, we also observed that the issue of unconscionability was not before us.

### 3. 2009 Assignment—Wertheim Released its Claim to Page's Royalties

In September 2006, the relationship between Page and Wertheim soured, and Page sued Wertheim for fraud and elder abuse and sought rescission of the 2006 Assignment, alleging Wertheim had isolated her from her family and induced her to transfer her music library to it for essentially $1,000.

On January 27, 2009, the parties settled this litigation, with Wertheim releasing all interest in the Page music catalog and Maibell assigning to Wertheim her claims against the Omidvar parties (2009 Assignment).  By its terms, the 2009 Assignment "superseded and replaced" all prior agreements between Page and Wertheim.

### C. Prior Complaints

Omidvar's loans to Page prompted four more lawsuits, two of which are relevant here—Case Nos. BC417798 and BC530925.

### 1. LASC Case No. BC417798 and Cross-Complaint

The first lawsuit was filed not by Page or Wertheim but Omidvar.

On June 8, 2009, Wertheim, as Page's assignee, filed a form demand for arbitration with the American Arbitration Association (AAA), alleging Omidvar defrauded Page.  Wertheim contended that each of the scores of transactions between Omidvar and Page was subject to an arbitration clause found in the June 2006 Note.  It demanded $5 million.

6

Omidvar sued Wertheim and Page to enjoin the arbitration, LASC Case No. BC417798. (See *Currency Corp. v. Wertheim* (May 20, 2011, B222851) [nonpub. opn.].)

Page and Wertheim cross-complained against Omidvar, alleging, as in the arbitration, that Omidvar defrauded Page.

After years of litigation and several appeals, the cross-complaint was dismissed and the court entered judgment for Omidvar against Wertheim. (See *Wertheim v. Superior Court* (June 25, 2015, B262513) [nonpub. opn.].)

### 2. LASC Case No. BC530925

In December 2013, Christoper Page (representing the estate of Maibell Page) and Wertheim filed an independent lawsuit against Currency (here Omidvar), LASC Case No. BC530925, asserting causes of action like those Wertheim and Page had asserted in their cross-complaint in Case No. BC417798. Wertheim and Christopher essentially alleged that Currency defrauded Maibell.[4]

On December 16, 2015, the trial court dismissed the lawsuit as time-barred.

## D. Instant Complaints

### 1. LASC Case No. BC395819—2006 Assignment

In 2008, Wertheim sued Omidvar for interference with the 2006 Assignment, LASC Case No. BC395819.

### 2. LASC Case No. BC598307—2009 Assignment

In 2015, Wertheim sued Omidvar for inducing breach of the 2009 Assignment between Wertheim and Page, interference with that assignment, intentional and negligent interference with prospective economic advantage derived from Wertheim's

---

[4] We will sometimes refer to the Pages by their first names for clarity. Any reference simply to "Page" is to Maibell.

7

relationship with Page, and violation of the Racketeer, Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962; RICO), LASC Case No. BC598307.

The trial court consolidated the two lawsuits.

The 2015 complaint exemplifies Wertheim's basic claims as to both the 2006 and 2009 Assignments.[5] In it, Wertheim alleges at length that Omidvar's practice is to defraud elderly artists and their heirs, including Page, by purportedly lending them money derived from their own royalty streams, charging exorbitant interest and fees for the privilege, and making no accounting, all memorialized by unconscionable, illegal, and void promissory and assignment agreements.

Wertheim alleges that it agreed with Page, in exchange for the 2006 and 2009 Assignments, "to seek justice" for Omidvar's "long-running scheme . . . to steal money, benefits, and royalties from an elderly widow . . . by way of predatory and fraudulent lending practices . . . in connection with a continuous series of 'loans' purportedly made to Page pursuant to [illegal and void] contracts[,] and [by way of] the . . . theft of Page's retirement funds."

Wertheim alleges that when Omidvar learned of the 2006 and 2009 Assignments between Wertheim and Page, it threatened Page, her children, and her trust "with shakedowns, financial ruin, [and] tax and IRS problems if the Pages brought claims against [Omidvar] and/or cooperated with Wertheim in pursuing their claims against [Omidvar]."

---

[5] It has been a challenge to parse out the claims in the 2015 complaint, which comprises 76 pages and 252 paragraphs and is short on factual allegations and long on evidentiary assertions and argument.

Wertheim alleges that Omidvar induced Page to breach and repudiate the 2006 and 2009 Assignments by extorting and exercising undue influence on Page; slandering Wertheim and Pullman; falsely telling Page that Omidvar had committed no wrongful acts; forgiving loans; arranging to provide the services of its attorney to Page; promising to defend Page from any claims by Wertheim; causing Page to sue Pullman (in LASC Case No. BC358871); interfering with a mediation involving Page's children, Christopher and Jennifer Page; causing Page to dismiss her cross-complaint in LASC Case No. BC417798; and causing Christopher Page to dismiss his claims against Omidvar in Case No. BC530925, *ante*.

Wertheim alleges that because of Omidvar's conduct, Page "refus[ed] to join with [Wertheim] in the pursuit of the Claims" against Omidvar.

**E.    Summary Judgment**

Omidvar and Wertheim filed cross-motions for summary judgment or adjudication.

Omidvar argued that contrary to Wertheim's allegations, Omidvar's only communications with Page or her children pertained to Page's legal claims against Omidvar, its defenses against Wertheim's claims, and the repayment of Page's loans.

Omidvar argued:  (1) Wertheim's second interference complaint, Case No. BC598307, was a sham designed to circumvent an order staying proceedings on the first interference complaint, Case No. BC395819; (2) all claims were barred by the res judicata effect of the dismissals in Case Nos. BC417798, *ante* (Wertheim's cross-complaint in Omidvar's original action), and BC530925, *ante* (Page's and Wertheim's separate lawsuit); (3) Wertheim's claims were barred by the litigation privilege set forth in Civil Code section 47; (4) Omidvar's conduct was not wrongful because it was designed only to protect its own

9

contracts with Page, not to interfere with Wertheim's contracts or economic relationships; (5) the 2006 and 2009 Assignments were invalid, as we held in *Borisoff v. Pullman Grp., LLC* (Sept. 1, 2016, B259675) [nonpub. opn.], involving a similar assignment between Wertheim and another Omidvar borrower, and a jury found in another case involving an assignment with a different Omidvar borrower; (6) Wertheim suffered no damages because the claims Page assigned to it were worthless; (7) Wertheim's claims were time-barred; and (8) Parviz, Oliver and O'Neil Omidvar, as well as Music Royalty Consulting and Entertainment Factors, were improper parties because they did no business dealings with Page.

Omidvar supported its motion with declarations from its principals, requests for judicial notice of various pleadings and rulings, and declarations filed in earlier litigation.

For example, Omidvar offered a 2015 declaration by Christopher Page, Maibell's son, filed in Case No. BC530925 (Page's and Wertheim's separate lawsuit against Omidvar), in which he stated that in June 2006, when Page entered into the 2006 Assignment with Wertheim, she was "largely incapacitated as a result of a stroke."

Omidvar also offered excerpts from Page's testimony in the arbitration proceedings to the effect that after she suffered a stroke, she began to rely on Christopher to manage her financial affairs and did not understand the 2006 Assignment when she signed it. During portions of her testimony in the arbitration proceedings in 2009, Page could not remember her age, did not understand what the proceedings were about, did not understand documents she was shown, and was confused about the events of 2006.

Finally, Omidvar offered a 2013 declaration by Christopher Page, in which he basically recited our observations in *Currency*

10

*2013*, *supra*, B240444, regarding statements Jennifer Page, Maibell's daughter, made early in the litigation about Page experiencing severe anxiety after her stroke and suffering disorientation, depression, panic attacks and difficulty writing and speaking.

Omidvar argued that the 2006 and 2009 Assignments were invalid because Page was incompetent when she agreed to them. Omidvar supported this argument solely with a citation to item 11 of its separate statement, which adduced as support for the argument only our observation in *Currency 2013*, *supra,* B240444, that "Wertheim admitted it extracted financial agreements from 'an unsuspecting elderly widow with short term memory loss, who had been institutionalized for mental illness.' "

In opposition to summary judgment, Wertheim argued that our observation in *Currency 2013*, *supra*, B240444, was taken out of context, and pertained only to the June 30, 2006 Assignment (and, ironically, with equal force to Omidvar's June 2, 2006 Note), and did not consider the 2009 Assignment, by which Page ratified the 2006 Assignment.

Wertheim supported his opposition with Pullman's declaration that when she entered into the assignment agreement on June 30, 2006, "Page seemed completely competent, and appeared to understand all of the terms of the assignments."

Wertheim also offered the May 16, 2007 deposition testimony of Craig Lachman, the notary on the 2006 Assignment, who stated that when she agreed to the assignment, Page "was interested in signing the documents," and "if she had any questions about the document, . . . she would then address those to Mr. Pullman."  Pullman "would explain to her what was going on . . . with the document, and then she would sign it."

Each side filed objections to the other's evidence.

The trial court granted summary judgment to Omidvar on the sole ground that our purported "factual finding" in *Currency 2013*, *supra*, B240444, i.e., that on June 30, 2006 Page was an "unsuspecting elderly widow with short term memory loss, who had been institutionalized for mental illness," established that Page was incompetent when she entered into both the 2006 and 2009 Assignments. The court reasoned that Wertheim failed to provide evidence rebutting our finding, and thus no triable issue existed as to whether the assignments were invalid because we had found that they were not.

Accordingly, the court granted Omidvar's motion for summary judgment and denied Wertheim's.

## DISCUSSION

Wertheim contends summary judgment was improper because no finding has ever been made as to Page's competence when she entered into even the 2006 Assignment, much less the 2009 Assignment. Therefore, Wertheim argues, Omidvar's simply reciting our observation in *Currency 2013*, *supra*, B240444, failed to carry its burden on summary judgment. We agree.

## A. Applicable Law

A trial court properly grants summary judgment " 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) A defendant may establish its right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).)" (*Neiman v. Leo A. Daly Co.* (2012) 210 Cal.App.4th 962, 967.) "Once the moving defendant has satisfied its burden, the burden shifts to the

plaintiff to show that a triable issue of material fact exists as to each cause of action.  [Citation.]  A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid*.)

On appeal, we apply an independent standard of review to determine whether a trial is required—whether the evidence favoring and opposing the summary judgment motion would support a reasonable trier of fact's determination in the plaintiff's favor on the cause of action or defense.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  In doing so we view the evidence in the light most favorable to the party opposing summary judgment.  (*Id.* at p. 843; *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.)  We accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them.  (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385-1386.)

**B.    Application**

**1.    Page's Competence**

As noted above, the trial court relied on only one piece of evidence—our observation in *Currency 2013*, *supra*, B240444—to support its finding that Page was incompetent when she agreed to the 2006 Assignment, which the court found rendered both the 2006 and 2009 Assignments unconscionable, thereby establishing that no triable issue existed as to any of Omidvar's four causes of action.

(Omidvar argues that the court did not rely exclusively on our observation, but instead stated it relied on "the evidence

13

provided by [Omidvar]." Omidvar is correct that the court said that, but it was referring only to the observation.)

We preliminarily note that Omidvar's summary judgment motion and the trial court's ruling impliedly relied, sans authority, on the premise that an unconscionable 2006 contract cannot be the predicate for causes of action for interference with that contract, interference with a related 2009 contract, interference with prospective economic advantage derived from the 2009 contract, or RICO violations premised on such interference. Given that the parties offer no significant briefing on the issue, for the sake of argument we will assume the implied premise is valid.

Even so, our observation in *Currency 13*, *supra*, B240444, was not evidence of any fact regarding Page's mental state, her competence, or the validity or conscionability of the 2006 or 2009 Assignments.

An appellate court generally does not make factual findings, and in *Currency 2013*, *supra*, B240444, we expressly stated we were only making "an observation about th[e] litigation," after which we summarized the parties' admissions. The sentence upon which Omidvar relied, that in 2006 Page was " 'an unsuspecting elderly widow with short term memory loss, who had been institutionalized for mental illness,' " was our quotation of an argument Wertheim made to challenge Omidvar's June 6 Note. We observed that pursuant to the parties' admissions, both sides' conduct in June 2006 was unconscionable. We did not intend to find, and did not find, that Wertheim's argument established Page's incompetence.

The trial court therefore erred in finding that our observation in *Currency 2013*, *supra*, B240444, carried Omidvar's

14

burden on summary judgment. It did not, and because it did not, Wertheim had no obligation to present controverting evidence.

In any event, the evidence of procedural unconscionability was equivocal. Pullman declared here, and Craig Lachman, the notary, testified in 2007, that Page was alert enough in 2006 to ask questions concerning the assignment, and Pullman explained it to her before she agreed to it. This evidence raised the reasonable inference that Page understood the agreement, and thus established a triable issue as to procedural unconscionability.

Omidvar argues that Pullman's declaration failed to create a triable issue because he lacked credibility, and the declaration was greatly outweighed by "all the other independent evidence of Page's incompetence." Omidvar similarly argues that Lachman's 2007 testimony was unreliable because he had been paid by Pullman, and offered the testimony only at Pullman's request.

Considerations about witness credibility and bias, and the overall weight of the evidence, are matters for a trier of fact, and cannot support summary judgment.

### 2. Other Grounds for Summary Judgment

Omidvar argues that we may affirm summary judgment on any ground asserted by the moving party and supported by the record. We agree. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.) However, no such grounds exist.

### a. Decisions in Other Cases

Omidvar argues no triable issue exists as to the validity of the 2006 and 2009 Assignments because other appellate courts have held (and one jury has found) those or substantively identical assignments to be unconscionable in other cases involving other Omidvar borrowers. We disagree. Even were we

15

to contemplate the holdings and findings of other courts (and one jury) that substantively identical assignments are unconscionable in other cases unconscionability is a product not only of contract language but also the circumstances surrounding contract formation. That similar assignments were held to be unconscionable in other cases would not establish that the 2006 and 2009 Assignments were unconscionable here.

b. Claim and Issue Preclusion

Omidvar argues that Wertheim's interference claims are precluded because they are "essentially identical" to the claims raised in Wertheim's cross-complaint in Case No. BC417798 (the lawsuit to enjoin arbitration) and Case No. BC530925 (Chrisopher and Wertheim's lawsuit), and could have been raised there. We disagree.

Claim preclusion bars litigation of a cause of action that was or could have been litigated in a prior proceeding. (*Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 975.) Issue preclusion prevents "relitigation of previously decided issues," rather than cause of action "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 825.)

The cross-complaint in Case No. BC417798 and the complaint in Case No. BC530925 asserted causes of action based only on Omidvar's fraud as to Maibell. There was no cause of action for interference with the 2006 or 2009 Assignments. Although both complaints alleged as background that Omidvar interfered with the assignments, no claim was grounded on that interference.

16

Wertheim's interference claims are entirely distinct from Page's claims (and Wertheim's assigned claims) that Omidvar defrauded Page. The issues raised by Wertheim's claims have never been litigated. Therefore, neither issue nor claim preclusion supports summary judgment here.

c. Statute of Limitations

Omidvar argues that no triable issue exists as to whether Wertheim's claims are time-barred. We disagree.

A limitations period for injury arising from an ongoing course of misconduct begins to run from the " 'last overt act' " completing the misconduct. (*Wyatt v. Union Mortg. Co.* (1979) 24 Cal.3d 773, 786; *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192.)

Wertheim alleges in its second interference complaint that Omidvar interfered with the 2009 Assignment in a continuous course of conduct up to as late as 2014. The second interference complaint was filed in 2015, within any applicable limitations period. Wertheim also alleges, and Omidvar does not dispute, that the 2006 and 2009 Assignments relate to exactly the same rights and conduct. (Omidvar insists that Wertheim's conduct with respect to the 2006 Assignment is inseparable from his conduct with respect to the 2009 Assignment.) That being the case, we discern no practical way to distinguish between the 2006 and 2009 Assignments for limitations purposes.

d. Litigation Privilege

Omidvar argues no triable issue exists as to whether the litigation privilege set forth in Civil Code section 47 bars Wertheim's claims. We disagree.

Wertheim alleges a broad course of misconduct that involves both litigation and nonlitigation activity. To be sure,

17

some of the alleged misconduct, for example Omidvar's alleged interference with Wertheim's litigation, is privileged. But not all is. For example, Wertheim alleges Omidvar threatened and extorted Page. We decline at this level in the proceedings to sift through the evidence and allegations to excise claims involving only privileged activity, and will leave that task to the trial court.

**C.     Conclusion**

For the reasons discussed above, we conclude that summary judgment was improper.

**DISPOSITION**

The order is reversed. Appellant is to recover its costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

18