Filed 6/26/13  Duke Gerstel et al. v. DeMarco CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DUKE GERSTEL SHEARER, LLP, | D059999 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00102612-CU-BC-CTL) |
| LAURA DEMARCO, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County,

Richard E.L. Strauss, Judge.  Affirmed.

Duke Gerstel Shearer, Alan R. Johnston, Andrew F. Lloyd and Katherine L.

Dwyer for Plaintiff and Appellant.

Procopio, Cory, Hargreaves & Savitch and Kendra J. Hall for Defendant and

Respondent.

Duke Gerstel Shearer, LLP (Duke) brought suit against Laura DeMarco for breach

of an oral agreement.  Duke alleged DeMarco agreed to pay for legal representation of a

third party. DeMarco maintained she agreed to pay up to $10,000 for Duke's services, but nevertheless, Duke billed her over $118,000. The matter proceeded to a bench trial, and the trial court found in favor of DeMarco.

Duke appeals, contending the court erred in finding no contract existed and failing to award it the reasonable value of its services. It also asserts that neither the statute of frauds nor the statute of limitations bars its claim. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Facts*

The Property

The Del Mar School District (the school district) owned 5.3 acres of coastal real property (the property). The Kerckhoff Company conveyed the property to the school district in 1946. The property is subject to a 1946 deed restriction, which provides that the school district must use the property for school purposes, and upon any breach of the restriction, fee ownership of the property will revert to the Kerckhoff Company.

In August 2005, the school district filed a quiet title action and in February 2006 obtained a default judgment removing the deed restriction. At a school district meeting in May 2006, the school district announced that the deed restriction had been removed. Around this time, the school district was claiming it had a $32 million offer from a private entity to purchase a portion of the property.

The City of Del Mar (the City) also expressed interest in purchasing the property. During early 2006, the City was negotiating to purchase at least a portion of the property,

2

but the negotiations reached an impasse in May 2006. On May 5, 2006, the City filed a lawsuit against the school district to stop any private sale of the property.

The Parties and Duke's Services

DeMarco is the former chairwoman of a nonprofit volunteer fundraising committee known as the "Campaign to Save Del Mar Shores" and the cofounder and vice-president of an organization known as the Friends of Del Mar Parks. After learning of the school district's quiet title action, DeMarco researched the 1946 deed restriction and brought it to the attention of the school district at a meeting in May 2006. DeMarco also began discussing the issue with Andrew Lloyd, an attorney with Duke, and also a resident of Del Mar who was aware of the City's desire to purchase the property for public use. DeMarco considered Lloyd to be a friend. She had gone to college with Lloyd's wife and their sons were friends. Like DeMarco, Lloyd wanted to preserve the school and fields located on the property.

Lloyd met multiple times with DeMarco and Del Mar City Council member Carl Hilliard in June 2006. At the first meeting, Lloyd's wife, DeMarco's husband, and Hilliard's wife were also present. During one of the meetings, Lloyd described his plan to have the default judgment vacated. He suggested that he represent Elise Kerckhoff (Elise) for this endeavor because she was a descendant of the Kerckhoff family that deeded the property to the school district. Hilliard did not believe Elise had standing to bring a motion to vacate the default judgment.

DeMarco testified that Lloyd offered to represent Elise for $10,000 to "basically get the deed restriction that had been removed by the judge put back on" the property.

3

DeMarco, her husband, and Hilliard all testified that the $10,000 agreement included all activities necessary to challenge the quiet title action (e.g., serve the complaint and reinstitute the deed restrictions), not just activities associated with a motion to set aside the default and default judgment. In contrast, Lloyd testified that his $10,000 estimate only covered a motion to set aside the default judgment.

DeMarco later informed Lloyd that he was selected to represent Elise. DeMarco believed that Lloyd had a passion for the cause as he had performed pro bono services[1] with regard to the default judgment prior to being retained. Indeed, Lloyd agreed with DeMarco's cause "100 percent." DeMarco also was aware that Lloyd had already looked into the matter before he was retained, and therefore she agreed to pay $10,000, believing that given Lloyd's knowledge of the issues, Duke's representation of Elise would be cost effective.

DeMarco approached Elise about serving as Lloyd's client, but Elise's brother was concerned about the school district suing Elise based on her involvement with the quiet title action. Thus, DeMarco ultimately agreed to indemnify Elise. Lloyd prepared a fee agreement for Elise's signature and an indemnity agreement for execution by DeMarco. DeMarco was not a party to and was not provided a copy of the fee agreement. DeMarco executed the indemnity agreement without being provided a copy for advance review or being advised to obtain independent legal counsel.

---

[1]    Lloyd conducted the research regarding the default judgment and issues regarding the property without charge.

Duke's fee agreement with Elise described Duke's scope of services to include: "pursuit of your claims and interests relating to the restriction on the deed of the property commonly known as the 'Del Mar Shores School' limiting its use 'for school purposes only.' " It also held Elise responsible for paying Duke's fees and costs: "It is understood and agreed that you shall pay for legal services rendered in connection with the above representation at the hourly rates then in effect for attorneys and any paralegals assigned to your case." Additionally, the fee agreement provided that monthly invoices would be sent to Elise and would include a description of services rendered and any costs incurred. The fifth paragraph of the fee agreement stated: "As you are aware, Laura DeMarco ('Non-Client') has agreed to pay your legal fees in connection with our representation of you in this matter."

The indemnity agreement provided, in pertinent part, that in consideration of Elise challenging the Del Mar Shores deed restriction "without fear of negative economic impact due to actions taken by the Del Mar Union School District, or anyone claiming under said District, Laura DeMarco agrees to indemnify and hold Elise Kerckhoff harmless from and against, and will pay on demand, any and all claims, losses, judgment, liabilities, damages, costs and expenses suffered or incurred by Elise Kerckhoff . . . arising out of, resulting from, or relating to" her motion to vacate the District's default and default judgment eliminating the Del Mar Shores deed restriction. The purpose of the indemnity agreement was to protect Elise in the event the school district decided to

5

pursue a claim against her for damages caused to the value of the property as a result of enforcing the deed restriction.[2]

Ultimately, DeMarco, who had never retained the services of a lawyer before, orally agreed with Lloyd to be responsible for guaranteeing Elise's payment of legal fees to Duke up to a maximum of $10,000 and to indemnify Elise from any adverse economic consequences asserted by the school district against Elise arising out of Elise's involvement in the action. However, DeMarco and Duke did not enter into a written contract addressing the payment of Elise's legal fees.

On July 19, 2006, Duke moved to set aside the default judgment on behalf of Elise. The court granted the motion. Subsequently, City residents elected new school board members, the majority of which favored selling the property to the City for public use, and negotiations between the school board and the City resumed. Accordingly, DeMarco believed that Duke was no longer aggressively challenging the school district's quiet title action because the ultimate purpose of her agreement to pay $10,000 of Elise's fees had been achieved by the election of a new school district board that had publicly stated its intention to sell the property to the City. Instead, and unbeknownst to DeMarco, Duke continued to bill significant fees in preparation for trial on the merits of the quiet title action.

On February 21, 2007, Lloyd requested a meeting with DeMarco to discuss the status of the school district's quiet title action. DeMarco testified that at the meeting, also

---

2    Lloyd testified that he drafted the indemnity agreement with the intent to "make sure that there was going to be no costs, under any circumstances, to Elise Kerckhoff."

attended by Hilliard, Lloyd presented an invoice (without time/action details) to DeMarco in the amount of $10,294.28. DeMarco testified she had received no monthly billings up until that time. DeMarco further testified she believed that the invoice was a final bill for Elise's fees and that it included all legal fees incurred by Duke through February 2007. The invoice, however, represented Duke's services only through September 2006, excluding billings for work performed over a period of seven months. DeMarco immediately paid Duke the agreed upon $10,000 for Elise's fees believing Duke was then paid in full. The parties' versions of the discussions following DeMarco's payment differ significantly.

In updating DeMarco and Hilliard regarding the status of the school district's quiet title action, Lloyd indicated that Duke and the school district's attorneys were contemplating new motions, and that costs of asserting Elise's interest in the 1946 deed restriction could exceed the original $10,000 by "a bit more." DeMarco testified that she understood that the case was not completely over and that there would be a "service issue" that "would be a bit more," meaning a few thousand dollars.

DeMarco testified: "You know, when I hired [Lloyd], I thought I was the client. I thought he had a duty to me. [¶] . . . But in this particular case, [Lloyd] had no duty to me. He had no duty to send me invoices. According to this and according to his testimony, he had no duty to even send [Elise] invoices. To him this was a blank check, and that was not my intent." Specifically, DeMarco testified that she was never told services would cost "tens of thousands of dollars" or that she would also be paying for the services of another firm.

7

DeMarco also testified:

"Q: . . . As you sit here today, do you categorically say that Mr. Lloyd never told you that [on a going-forward basis, Duke's fees would be tens and tens of thousands of dollars] at the February 21st, 2007 meeting?

"A: Yes, he never said that. And I'm glad that [Hilliard] didn't hear it, because I was wondering if I was in the twilight zone. Obviously there was a major miscommunication."

Hilliard, who was also present at the meeting where DeMarco paid Duke $10,000, testified consistently with DeMarco:

"Q: Do you ever recall attending a meeting with Ms. DeMarco and Mr. Lloyd where Mr. Lloyd gave an indication that the going-forward litigation fees would be tens and tens of thousands of dollars?

"A: I would have recalled that particular comment. The answer is no.

"Q: Why would you have recalled that particular comment?

"A: For two reasons. One, in earlier conversations, Mr. Lloyd had indicated that the cap on his services would be $10,000. Two, tens and tens of thousands of dollars under the existing circumstances would just not be appropriate."

In contrast, Lloyd testified that as he and DeMarco were walking out of the meeting, he made "kind of a final comment" that the additional costs for his services would be "tens and tens of thousands of dollars." According to Lloyd, DeMarco supposedly responded: "Well, just try to keep the fees down."[3]

---

[3] Lloyd also claimed to have had a subsequent telephone conversation with DeMarco wherein she authorized him to retain another firm and told him that she would "pay him whatever it takes."

8

Lloyd admitted that even though DeMarco was "very cost conscious" he did not tell her that when she paid the invoice for $10,294.28, Duke's actual total fees through that February 21, 2007 meeting were actually much greater than the amount stated on the invoice. Following the meeting where DeMarco paid Duke, Duke also did not provide DeMarco with any update regarding fees estimated or incurred in continuing to represent Elise in the quiet title action. And even after the trial court granted a summary judgment motion in favor of the school district on the grounds that Elise lacked standing to challenge the quiet title action, Duke's billing did not cease. DeMarco, however, believed that Duke's representation of Elise ended at that point because Elise was adjudged to have no standing.

Approximately one month after the court granted summary judgment in favor of the school district, DeMarco was provided a second invoice dated June 4, 2007, from Duke in the amount of $32,582.21. The invoice included $9,132.50 in costs passed through to Elise in the form of third party legal services provided by another law firm (Duckor Spradling Metzger & Wynne) through March 31, 2007, but did not include fees already incurred during April and May 2007. DeMarco was unaware that the invoice was understated by approximately $50,000, and that total fees incurred by Duke through the date of the invoice were approximately $95,000 including the previously paid $10,000. Because she believed the June 4, 2007 invoice in the amount of $32,582.21 was excessive and contrary to her oral agreement with Lloyd to guarantee fees in an amount equal to "a bit more" than the original $10,000, DeMarco did not pay it.

9

Following delivery of the June 4, 2007 invoice, Duke continued to represent Elise even though the record is unclear what knowledge, if any, DeMarco had regarding the services Duke was providing. Lloyd, nonetheless, testified that "it was assumed" that he was going to be paid at the end of the case, even though he had no specific discussion with DeMarco about the work he was doing for payment.

On or about December 15, 2008, Duke delivered a third invoice to DeMarco in the amount of $108,205.81 (representing total legal fees of $118,205.81 including the previously paid $10,000) covering the approximately one-year period from April 2007 through March 2008.[4] DeMarco received this bill approximately 18 months after the last invoice provided to DeMarco and showed a total of over $100,000 in new billings. DeMarco testified that she had not talked to Lloyd about Duke's representation of Elise for at least a year prior to receiving the invoice. DeMarco did not pay the final invoice because the bill was "way beyond the scope of our agreement. It was outrageous . . . . I had given what I thought were very clear instructions and clear goals. One, I did not want to spend a lot of money. This was way beyond anything I ever imagined."

The Complaint and Trial

After DeMarco refused to pay any of the invoices beyond her payment of $10,000, Duke filed suit against DeMarco and Elise alleging a breach of contract. After DeMarco

---

[4]     The invoice included a lump sum amount of $28,368.61 passed through to DeMarco in the form of third party legal services provided by Duckor Spradling Metzger & Wynne through August 31, 2007, not including a credit for a 15 percent discount Duckor Spradling had given Duke.

10

successfully demurred to the complaint based on a lack of a written contract between Duke and her, Duke filed a first amended complaint, alleging a breach of an oral contract.

The case proceeded to a bench trial against DeMarco only (Duke did not serve Elise). After a four-day trial, the court found in favor of DeMarco. The court characterized the case as a "he said/she said kind of situation." It further stated that Duke did not carry its burden of proof.

The court noted that DeMarco wanted to limit her exposure "early on to $10,000, and then possibly a bit more[,]" but did not find it credible that she would agree, "out of the blue," that Duke could bill her for significantly more than $10,000 without any direction from her. The court ruled that there was not an agreement: "Mr. Lloyd thought certain things were agreed to, and Ms. DeMarco thought different things were going on, and you can't have a contract without a meeting of minds." The court characterized the parties as "ships passing in the night."

The court also found that Duke's claim was barred by the statute of limitations and the statute of frauds.

## DISCUSSION

Duke contends the court erred in finding that no oral contract existed. Instead, it asserts the agreement between Duke and DeMarco to pay Duke for further legal services was not a disputed issue. As such, it argues the court erred in finding there was no "meeting of the minds" because the existence of the contract was conceded. It also maintains that neither the statute of limitations nor the statute of frauds bar its claim. Because we agree with the trial court that Duke failed to prove the existence of an

11

agreement for DeMarco to pay for Duke's additional legal services on behalf of Elise, we do not reach Duke's statute of limitations and statute of fraud arguments.

Here, Duke's contention hinges on the premise that DeMarco conceded she had entered into a contract to pay for the legal services Duke provided Elise. Contract formation requires mutual consent, which cannot exist unless the parties "agree upon the same thing in the same sense." (Civ. Code, §§ 1580, 1550, 1565.) "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.) "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141; see also *Meyer v. Benko* (1976) 55 Cal.App.3d 937, 942-943 [existence of mutual consent "is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe"].)

Here, DeMarco offered evidence at trial that she believed she agreed to pay up to $10,000 for Duke to represent Elise to restore the deed restriction and prevent the school district from selling the property to a private entity. She does not dispute that she subsequently agreed to pay "a bit more" than the $10,000 promised. Duke interprets DeMarco's consent to pay "a bit more" as evidence that the parties agreed to a contract, but did not agree regarding the amount to be paid. Thus, Duke argues the parties did not

12

dispute that they entered into a contract, and the court, as the trier of fact, merely had to determine the reasonable amount DeMarco should have paid Duke for its legal services. We are not persuaded.

We agree that the parties entered into an oral agreement whereby DeMarco agreed to pay up to $10,000 for Duke to represent Elise in regard to the school district's quiet title action. Duke complied with this contract by obtaining relief from the default judgment. DeMarco also fulfilled the terms of the contract by paying Duke $10,000 after she received Duke's first invoice. The disagreement between the parties arises out of DeMarco's comment that she agreed to pay "a bit more" than the previously agreed $10,000. She testified that she believed this additional amount would be a few thousand dollars. DeMarco testified she believed this additional amount would pay Lloyd to deal with the standing issue, which did not appear to be in Elise's favor.

Duke presented a much different version of what DeMarco agreed to after she paid the $10,000. Lloyd testified that he told DeMarco that the fees for Duke's continuing services would be "tens of thousands of dollars" and DeMarco agreed to pay Duke "whatever it takes."

Duke minimizes the parties' disagreement, and instead argues that in the context of an attorney fee dispute, "the rule has long been that '[i]n the absence of an agreement upon the subject, defendant must be deemed to have promised to pay the reasonable value of the services performed in his behalf and with his consent and knowledge.' (*Batcheller v. Whittier* (1909) 12 Cal.App. 262, 266-267 [*Batcheller*].)" Duke's argument misses the mark. Here, we are not faced with a situation where the parties did not discuss

13

or come to an agreement on the amount of fees to be paid. DeMarco believed that she had agreed to pay $10,000 and then "a bit more" for Duke's representation of Elise. Duke, on the other hand, believed DeMarco would pay for tens of thousands of dollars worth of fees. Thus, the rule Duke cites from *Batcheller* is not applicable here where the parties believe they had reached an agreement, but disagree as to the agreement reached. Put differently, the issue here is not that the parties agreed to a contract but not to the amount DeMarco would pay. Based on the parties' respective testimony, they appeared to have agreed to two different contracts.

For example, the parties did not agree on the scope of the services Duke would provide. DeMarco testified that she believed Duke's representation of Elise ended after the court ruled Elise lacked standing to challenge the school district's quiet title action. Duke, however, continued to litigate the matter on behalf of Elise, billing additional fees. Also , Duke did not regularly provide DeMarco with invoices for the fees incurred although Lloyd had promised to do so. DeMarco presented evidence that Duke did not consistently keep DeMarco abreast of (1) what was occurring in the quiet title litigation, (2) the amount of fees it was billing to represent Elise,[5] and (3) the fact Duke had hired another law firm to assist in its representation of Elise. In addition, although DeMarco was not Duke's client, Duke believed that DeMarco would be paying for the fees and

---

[5] We are troubled by the fact that Duke presented DeMarco with an invoice for $10,294.28 when it had already billed fees over $30,000 and failed to tell DeMarco of this fact at the time it provided the first invoice.

14

costs it billed Elise, but Duke did not show that it sought DeMarco's permission for billing additional fees in its representation of Elise.

Finally, it is apparent the parties did not agree on what was to constitute "a bit more." DeMarco testified that she was willing to pay a few thousand dollars more. She clearly did not believe the additional amount would be more than 10 times her original $10,000 cap. Nevertheless, at the end of the litigation, Duke presented her with an invoice that amounted to more than $108,000. No reasonable trier of fact could find that amount "a bit more" of $10,000. Under these circumstances, we agree with the trial court that the contract that Duke believes existed (i.e., DeMarco essentially provided a "blank check" to cover Elise's legal fees) was contested. Duke sued Demarco for breach of an oral contract that is much different than what DeMarco believed she agreed to.

"Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) Thus, we review the record to determine whether substantial evidence, even if contradicted, supports the court's finding there was not a contract.[6] (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

---

[6] Duke disagrees with this standard of review and cites *Sonic Manufacturing Technologies Inc. v. AAE Systems, Inc*. (2011) 196 Cal.App.4th 456 at page 466, arguing that the proper standard regarding the existence of an agreement is "whether the evidence compels a finding in favor of the appellant as a matter of law." We are unaware of this standard ever being applied to the issues presented here. Further, Duke's reliance on *Sonic Manufacturing* is misplaced. That case did not involve proving the existence of a contract and does not support the standard of review Duke urges here.

Here, substantial evidence clearly supports the court's finding that the parties did not enter into a contract. The parties did not agree on what constituted "a bit more," the scope of services, or the use of an additional law firm. While Duke presented evidence to support its version of the agreement, the court did not find the evidence credible.[7]

Because we find substantial evidence supports the trial court's finding that there was no contract, we do not reach Duke's contentions regarding the statute of limitations or the statute of frauds.

## DISPOSITION

The judgment is affirmed. DeMarco is awarded her costs on appeal.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.

---

[7] We also are not persuaded by Duke's argument that the trial court should have awarded it the reasonable value of its services. Based on the record, we struggle to see what value Duke provided beyond the initial $10,000. The dispute with the school district resolved primarily through political means, i.e., a new school board was elected and decided to sell the property to the City. After successfully setting aside the default, Duke's efforts were largely ineffective.

16