Filed 12/13/22 Apartment Rental Assistance II v. 80 Oak Hills CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| APARTMENT RENTAL ASSISTANCE II, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> 80 OAK HILLS, L.P., et al., <br><br> Defendants and Respondents. | F082214 <br><br> (Super. Ct. No. CV-60695) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County. Kevin M. Seibert, Judge.

Baker & McKenzie LLP, Perrie M. Weiner, Benjamin Turner, and Paul Chander; Chase Law & Associates and Kenneth E. Chase; Young Ward & Lothert and Scott Ward for Plaintiffs and Appellants.

Hogan Lovells US LLP, Michael L. Turrill, and Nicholas Lauridsen for Defendants and Respondents.

-ooOoo-

Defendants 80 Oak Hills, L.P. (Oak Hills LP), 80 Columbia Village Townhomes, L.P. (Columbia Village LP), 60 Forest View Senior Housing, L.P. (Forest View LP), and

Highridge Costa Investors, LLC (Highridge) (collectively, sellers) successfully sought summary judgment against plaintiffs Apartment Rental Assistance II, Inc. (ARA) and Oak Hills Housing (collectively, buyers) on their claims for breach of contract, unjust enrichment/quantum meruit, fraud/deceit, and negligent misrepresentation. On appeal, buyers challenge only the grant of summary judgment on their breach of contract claims. They contend the trial court erroneously weighed the evidence, improperly dismissed evidence that reasonably created a triable issue of material fact and overlooked a triable issue of material fact. Finding no merit to buyers' arguments, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

ARA is a real estate management company that acquires and operates properties in California and elsewhere. In 2016, ARA agreed to purchase three properties on which sat residential apartments known as the Oak Hills Apartments (Oak Hills), Columbia Village Townhomes Apartments (Columbia Village), and Forest View Senior Apartments (Forest View) (collectively, the properties) from Oak Hills LP, Columbia Village LP, and Forest View LP, respectively, whose related corporate entity is Highridge.

In early 2016, ARA received an offering memorandum for the properties from the brokerage firm CBRE, which listed the total price for the properties as $6.6 million. Based on the initial review of the offering memorandum, ARA's director of acquisitions, Alica Vysata, who was the "point person" for the transaction, found the properties were "newer build, very nicely kept and maintained;" "there was a lot of room in the rent … to push the rents" and "very high historical occupancy." She did not find anything was "inaccurate in the offering memorandum that CBRE had prepared." During the initial site visit in March 2016, Vysata found the properties were "maintained very well" and "[e]veryone only said great things about the property and—everybody seemed happy there." Vysata thought the listing price for each property was reasonable "especially on a per-unit basis" which was "well below replacement cost for such a nice asset."

2.

*The Purchase and Sales Agreements*

On October 11, 2016, ARA and the sellers entered into a purchase and sales agreement (PSA) for each property, with a total $6 million contract price for the three properties. Each PSA was a fully integrated agreement that governed all the terms of and matters relating to the purchase and sale of the properties. The PSAs acknowledged the buyers and sellers "are sophisticated in the buying and selling of income producing property similar to the Property and each has engaged its own sophisticated real estate counsel and advisors." ARA had experienced legal counsel representing it in the negotiation of the PSAs.

The conditions to close with respect to the conveyance of the properties were subject to and conditioned on the fulfillment of specific conditions precedent. These included ARA approving certain things before the expiration of the "Due Diligence Period," which encompassed 35 days from the effective date of October 11, 2016. As set forth in paragraph 3(a)(i)(5), ARA was required to approve the materials listed in Exhibit H,[1] which sellers were required to provide to ARA to the extent the materials

---

[1] Exhibit H, entitled "DUE DILIGENCE MATERIALS," lists the following: (1) the most recent resident rent roll setting forth certain information; (2) audited financial statements for the most recent three calendar years; (3) nonaudited financial statement with a detailed year-to-date income and expense report; (4) tenant deposit batch report for the last three months; (5) copies of the existing management plan; (6) a list of material capital expenditures for 2013 through year-to-date 2016; (7) personal property list; (8) current year's budget; (9) all service agreements; (10) 2016 utility allowance schedule; (11) trash and utility bills for the past six months; (12) property tax bills for the past two years; (13) list of current staff employed at the property; (14) residential lease form; (15) insurance loss runs for the past two years; (16) all certificates of occupancy and other permits and license for the improvements; (17) a schedule or statement of any personal injury, property damage or other claims actually known to the seller involving the property or any present or former tenant or guest or invitee of a tenant; (18) list of any pending litigation involving the property; (19) copies of environmental, zoning, fire and safety or building code reports, evaluations, complaints or notices of violations for the property; (20) copies of "compliance reports and correspondence for the last 12 months submitted to TCAC"; and (21) copy of the most recent "ALTA survey of the Property."

were in the sellers' possession or reasonable control. The sellers were not required to provide ARA with publicly available materials "or any of Seller's confidential, proprietary or privileged information, including, but not limited to, internal memoranda, reports, financial projections, budgets or appraisals." The paragraph further provided that "all documents and information made available by Seller to Buyer at any time are made as an accommodation only and Seller shall not have any liability, obligation or responsibility of any kind with respect to the content or accuracy of any such materials or to update, correct, or supplement any such materials or to provide any further documentation to Buyer except as expressly required by this Agreement." Paragraph 3(a)(iv)(1)(A) provided ARA's obligation to consummate "the Transactions" at closing was conditioned on, among other things, "all of Seller's representations and warranties contained in this Agreement shall be true and correct in all material respects as of the Closing …."

The sellers made certain representations and warranties under paragraph 9(b) of the PSAs. Specifically, the sellers represented the following in paragraph 9(b)(ii): "This Agreement and all documents executed by Seller in connection with this Agreement which are to be delivered to Buyer at Closing, are or at the time of Closing will be, duly authorized, executed and delivered by Seller, and are, or at Closing will be, legal, valid and binding obligations of Seller and do not, and at the time of Closing will not, violate any provisions of any agreement or judicial order to which Seller is a party or to which Seller is subject."

In paragraph 9(b)(iv), the sellers represented as follows: "To Seller's actual knowledge, Exhibit G is a complete list of all Service Agreements affecting the Property as of the Effective Date."[2] The PSAs defined the term "Seller's actual knowledge" as

---

[2] Exhibit G of the Oak Hills PSA listed the following service agreements: (1) settlement agreement and mutual general release dated May 27, 1997, by and among seller, Opportunity Builders, Inc., and the County of Tuolumne; (2) Clark Pest Control;

4.

"the current actual personal knowledge of, and only of, Paul Lee, with no imputation of knowledge and no duty of investigation or inquiry."

Paragraph 9(f) of the PSAs, entitled "Disclaimer of Seller Representations and Warranties" provided that: "Except as specifically stated in this Agreement … neither Seller nor any advisor, officer, director, trustee, partner, member, employee, agent, attorney or contractor thereof or therefor … has made or is making or shall be deemed to have made, nor does any Seller Party have the authority to make, any express or implied representation or warranty of any kind or nature as to the Property or the Transactions contemplated in this Agreement, including, without limitation, (1) the financial status of the Property, including without limitation, income or expenses generated, paid or incurred in connection with the Property, (2) the nature, physical or environmental condition, safety or any other aspect of the Property …, (3) the accuracy or completeness of any information or data provided or to be provided by Seller Parties, including, without limitation, copies of any reports or documents prepared for Seller Parties …. "

Further, ARA acknowledged that, "except as expressly provided in this Agreement or any of the documents to be executed and delivered by Seller to Buyer at Closing, the Property will be sold to Buyer 'AS IS', 'WHERE IS' and 'WITH ALL FAULTS', and except for the express Seller representations, warranties and duties contained in this Agreement and the documents to be executed and delivered by Seller to Buyer at

---

(3) The Grass Is Greener Landscape; (4) Web Service Company, LLC; (5) Comcast; and (6) Signal Service, Inc., for burglary and fire alarm system. Exhibit G of the Columbia Village PSA listed the following service agreements: (1) Cisco Fire Sprinklers, Inc.; (2) Clark Pest Control; (3) The Grass Is Greener Landscape; (4) WASH Multifamily Laundry Systems, LLC; (5) Comcast; and (6) Signal Service, Inc., for burglary and fire alarm systems. Exhibit G of the Forest View PSA listed the following service agreements: (1) WASH Multifamily Laundry Systems, LLC; (2) Clark Pest Control; (3) The Grass Is Greener Landscape; (4) Comcast; (5) Mountain Alarm, Inc.; and (6) Signal Service, Inc., for fire alarm service. The sellers were required to provide copies of the service agreements to ARA, which ARA could then either accept or designate for termination prior to closing.

5.

Closing, there are no representations, warranties and/or duties, express or implied, made or owed by Seller Parties in connection with the Transactions contemplated in this Agreement."

***ARA's Preclosing Due Diligence, Notice of Acceptance, and Closing***

As stated, by the terms of the PSAs, ARA had 35 days from October 11, 2016, to conduct its due diligence. ARA conducted "a physical inspection of the property," which includes environmental, went "over all the financial documents, rent rolls, any use agreements attached to the property, [and] affordable housing agreements," and reviewed "the title, survey, [and] service contracts." ARA's representative inspected the properties, checking "whatever they could see just from a tour of the property." A third party also conducted a physical inspection of the properties.

ARA's employees reviewed the properties' "Books and Records" listed on Exhibits H and G of the PSAs, which included financial statements, rent rolls, and affordable housing agreements, and they did not find anything unusual or out of the ordinary. Vysata "believed … what [she] received in due diligence … to be accurate and true."

As part of the due diligence process, ARA's lender ordered an appraisal for each property. In appraising a property, appraisers look at "sales comps" and "cash flows of the property from the financial statements." For ARA to continue with the closing, the properties "would have had to appraise at purchase price or higher." The lender's appraisals did not come in lower than the purchase price and there was no reason to believe the appraisals were not a fair evaluation of the properties. The properties appraised at a total value of $6 million, comprised as follows: (1) Oak Hills was valued at $2.8 million; (2) Columbia Village was valued at $2.45 million; and (3) Forest View was valued at $750,000.

According to Vysata, the appraisals were based on data the sellers provided and if the data were inaccurate, such as all the expenses not being captured, the valuations

6.

would be inaccurate. Vysata asserted expenses that were more than the usual incurred in running a building of its size and vintage should be disclosed, as that "would be important in arriving at our figure."

On November 17, 2016, ARA provided notices of approval for each property, which stated ARA "want[ed] to move forward … with the contract." Through the notices of approval, ARA approved the condition of the properties as well as the books and records the sellers provided. In pertinent part, the notices stated: "On behalf of Buyer, this letter shall constitute notice to Seller of Buyer's approval of all of the items set forth in Paragraph 3(a)(i) of the Original Agreement."[3]

ARA sent a representative to reinspect the properties two or three days before closing to ensure there had been no major changes since the property condition reports were issued. During its preclosing inspections, ARA generally requests a "unit-by-unit walk-through" as well as a "walk around the property." No issues were raised following the inspections that suggested the properties' conditions had substantially changed.

On December 22, 2016, ARA closed on each property for a final total purchase price of $6 million—$600,000 less than the initial list prices. According to Vysata, the purchase prices were adjusted based on ARA's review of the property's financials and data. Specifically, ARA arrived at the adjusted prices based on each property's rent and debt coverage.

***This Lawsuit***

ARA filed its initial complaint in March 2017 against the sellers and codefendants WinnCompanies, LLC (Winn), Jeffrey Chan, Roxanne Cowee, and Erin Daniels. The trial court subsequently granted Oak Hills Housing's petition to intervene as a coplaintiff

---

**3** The following were the items set forth in paragraph 3(a)(i) of the PSAs: (1) the title policy; (2) the leases and tenants; (3) the service agreements; (4) the condition of the properties; (5) the books and records listed in Exhibit H; and (6) the financing.

7.

on the ground Oak Hills Housing was ARA's designee pursuant to an assignment agreement executed around the time of the transactions at issue.

The complaint in intervention, which became the operative complaint, alleged causes of action for breach of contract against Oak Hills LP, Columbia Village LP, and Forest View LP and for unjust enrichment/quantum meruit, fraud/deceit, and negligent misrepresentation against all defendants.[4] Buyers alleged sellers: (1) provided incomplete and inaccurate due diligence materials; (2) failed to pay certain vendors for services rendered prior to the sale, which sellers did not disclose to buyers; (3) failed to conduct routine maintenance; (4) failed to pay bonuses and overtime to Winn's employees; and (5) failed to provide access to property management software known as "Yardi" after the sales closed.

Buyers alleged sellers' manipulation of data, omissions, failure to disclose expenses, and doctoring of other data resulted in an inflated valuation of the properties and instead of the $6 million they paid for the properties, the purchase price should have been $5 million or less. As damages for breach of contract, buyers sought compensatory damages of at least $600,839.88 against Oak Hills LP, $536.291.26 against Columbia Village LP, and $529,560.90 against Forest View LP. On their claims for unjust enrichment, fraud and deceit, and negligent misrepresentation, buyers sought actual damages of at least $1.5 million.

***The Summary Judgment Motion***

Sellers moved for summary judgment or, in the alternative, summary adjudication in February 2020. With respect to the breach of contract causes of action, sellers argued the undisputed facts failed to establish either that they breached the PSAs, or the buyers

---

**4**    According to plaintiffs, through successive demurrers and motions, the defendants remaining in the action when the instant summary judgment motion was ruled on were the sellers and Winn. Winn also brought a summary judgment motion, which the trial court denied; thereafter, Winn settled the litigation.

suffered damage. Specifically, sellers argued: (1) they could not be liable for any failure to conduct routine maintenance because the properties were sold as-is; (2) buyers could not prove they were damaged by the allegedly unpaid vendor invoices, as buyers did not allege they paid invoices that were sellers' responsibility and several invoices were never buyers' responsibility because they were directed toward sellers; (3) buyers did not have standing to assert wage claims on behalf of Winn's employees; and (4) sellers did not have a contractual obligation to provide buyers with access to Yardi.

As for the fraud and negligent misrepresentation claims, sellers asserted they did not make any misrepresentations to buyers. Sellers argued that because the PSAs expressly stated they are not liable for the content or accuracy of the due diligence materials, the due diligence information did not qualify as a representation. They further argued there was no fraudulent concealment because the items that purportedly needed repair were conspicuous. Sellers also contended buyers did not have evidence of justifiable reliance. Sellers argued that while buyers averred sellers' misrepresentations of certain financial information induced them to pay a higher purchase price, the allegations were ambiguous and broad sweeping. They further argued buyers offered no evidence they would not have paid $6 million for the properties, given the alleged defects were not concealable and they conducted multiple inspections during the due diligence period before expressly accepting the properties on an as-is basis.

Finally, sellers asserted if there was a triable issue of fact on any claim, Highridge should be dismissed from the action because it is not a proper defendant. Specifically, sellers pointed out ARA expressly agreed in the PSAs that any claims arising from the sale of the properties could only be made against the specific entity that sold the property, namely, Oak Hills LP, Columbia Village LP, and Forest View, LP, and only those parties were required to provide the due diligence materials to buyers.

In May 2020, sellers submitted a supplemental brief in support of their motion. Sellers explained that when they filed their summary judgment motion, buyers had not

9.

produced the property appraisals performed by an appraisal company buyers' lender selected. Sellers asserted the appraisals, which were lodged conditionally under seal pursuant to a protective order, indicated $6 million was the fair market value for all three properties at the time of the sale, with Oak Hills being valued at $2.8 million, Columbia Village at $2.45 million, and Forest View at $750,000. Sellers argued this evidence demonstrated buyers paid exactly what the properties were worth; therefore, they could not establish their theory of damages, i.e., that they paid over-inflated prices for the properties.

***The Opposition to the Summary Judgment Motion***

Buyers filed their opposition to the motion in July 2020, arguing it should be denied in its entirety. Buyers contended sellers breached the PSAs by (1) providing false information in due diligence when they "doctored the budget" to enhance the properties' net operating income and make the properties seem more attractive, and (2) blocking buyers' access to information so a data-sync could be performed. Buyers asserted sellers committed fraud by providing them with false financial information during the due diligence period, as the due diligence materials had been altered to remove expenditures, which made the properties look more profitable and artificially boosted their sales price. Buyers claimed they were damaged because they would not have paid the inflated price had they known the truth. Finally, buyers argued Highridge was a proper party to the tort claims because its employees actively authorized, directed and participated in the tortious conduct.

In support of their claim that Highridge manipulated financial data, buyers relied on excerpts from the deposition of Jeffrey Chan, who was the asset manager assigned to the properties for at least five years before the properties sold in 2016. Chan reported to Michael Snowdon, who oversaw the asset managers. Chan believed Winn began managing the properties two to three years before their sale. Chan knew the effect

10.

expenditures could have on net operating income, which in turn could affect valuation, and conceded Highridge wanted its properties to have good net operating incomes.

Chan testified that according to an April 2016 financial statement which Winn produced during discovery, Forest View had $7,808 less in year-to-date net operating income than was budgeted, which was off 30 to 40 percent. Chan agreed the lower net operating income would impact the property's value. Sellers produced a 12-month actual to budget statement for Forest View during discovery which lists $481.46 in "Total Operating and Maint. Exps." for April 2016. In contrast, an April 2016 report concerning Forest View's net operating income, which Winn produced during discovery, lists the month-to-date "Operating and Maint. Exps." for April 2016 as $2,507. The difference between the two figures is $2,025.54. The report produced by Winn also lists $6,345 in "Administrative Expenses" for the month of April 2016, while the report sellers produced shows $1,927.86 in "Total Administrative Expenses"—a difference of $4,417.14. Chan conceded the expenses between the two documents "look[ed] different." Buyers asserted they only received the seller-produced income statements in due diligence.

In support of their claim that sellers failed to inform them of unpaid invoices, buyers asserted the PSAs obligated sellers to inform them of inaccuracies and changed circumstances, but Vysata could not remember sellers advising buyers of any changed circumstances and she was unaware of any unpaid invoices before closing. Buyers asserted that after the closing, they received calls from vendors pertaining to 36 unpaid preclosing invoices totaling $27,854.93, which they emailed to sellers. These invoices were attached to buyers' attorney's declaration as Exhibit E; the attorney declared he emailed these unpaid invoices to sellers' principal on March 27, 2017. Buyers further asserted that after the closing, Winn located an additional 22 unpaid invoices for preclosing expenses totaling $10,768.69, which Winn produced during discovery. These invoices were attached to buyers' attorney's declaration as Exhibit F; the attorney

11.

declared the invoices were part of a "document production" that Winn served on September 12, 2017.

With respect to the data-sync issue, buyers submitted emails Winn produced during discovery which showed they asked to import historical data for the properties through a sync with sellers' Yardi computer system, a procedure Winn stated in an email was "very common." A Winn employee presented Snowdon with a document to allow the data transfer and told him while they were unable to share all the data, they checked off what they could share and if buyers submitted the form to Yardi, they should be able to access what they needed. Snowdon asked Chan if the document had been sent off, since "[t]here are some items that we don't want to share that [Winn] says is available." Snowdon asked Chan to call him. Soon thereafter, Snowdon emailed both the Winn employee and Chan: "They don't need all of this, as some might conflict with what was given in due diligence. Only the Yes that I didn't strike through." When asked if there was any reason why information provided in due diligence would conflict with the data in Yardi, Vysata testified, "I haven't seen that before, so I wouldn't think that that would be the case, no."

***Sellers' Reply***

In reply, sellers noted buyers abandoned their claims that sellers failed to (1) make repairs to the properties, and (2) make bonus and salary payments to Winn's employees, by not presenting evidence to support these allegations. Sellers further noted buyers failed to address the property appraisals which confirmed their valuation at the $6 million aggregate sales price, which defeated their claim they paid too much for the properties. Sellers asserted buyers' remaining theories of liability advanced in their opposition—sellers manipulated financial statements, failed to pay certain invoices issued prior to closing, and failed to provide access to Yardi—were without support in the evidence presented.

On the first point, sellers argued (1) the financial statements and documents were inadmissible because they were not properly authenticated, and (2) even if admissible, buyers failed to show they manipulated data. Sellers asserted the operating and maintenance expenses listed on the Winn-provided statement were recategorized in the income statement buyers admitted was provided to them before closing. Specifically, sellers pointed out "Operating & Maintenance" expenses for Forest View on the Winn-provided statement totaled $2,025, comprised of: (1) exterminating contract—$112; (2) rubbish removal—$927; (3) cable expense—$21; (4) security contract—$165; and (5) grounds contract—$800. Sellers explained these items were recategorized in the income statements provided to buyers during the due diligence period, with the "Cable Expense" recategorized under "Administrative Expense" and the other four items recategorized under "Contract Services."

Sellers asserted the same occurred with the Forest View's administrative expenses. On the Winn-provided statement, the $4,597 in administrative expenses was comprised of: (1) office payroll—$17; (2) management fee—$1,614; and (3) manager's payroll—$2,966. These items were recategorized in the income statements provided to buyers during the due diligence period, with office and manager's payrolls recategorized under "Payroll" and management fee under "Management Fees."

Based on this, sellers argued the financial data, as shown on the Winn- and seller-provided statements, were not manipulated. Sellers further noted the April financial statement provided to buyers during due diligence showed higher total expenses and less net operating income than the preliminary Winn statement for the same period, thereby "eviscerating" buyers' argument sellers were attempting to artificially deflate operating expenses to make the properties appear more valuable than they were.

With respect to the allegedly unpaid vendor invoices, sellers argued: (1) the invoices were inadmissible because they were not properly authenticated; and (2) the PSAs did not require them to provide invoices or documents pertaining to the period after

13.

September 30, 2016, and did not require that all invoices be paid prior to closing. Sellers asserted a review of the invoices buyers emailed to sellers demonstrated that virtually all were dated after September 30, 2016, and many were dated after the December 22, 2016, closing.[5] Sellers further argued buyers failed to present any evidence (1) sellers were required to provide copies of invoices or pay them before closing, (2) sellers did not ultimately pay the invoices, or (3) buyers were damaged by the unpaid invoices. Sellers conceded the invoices were not provided to buyers in due diligence, but contended they were not required to do so.

With respect to the data-sync issue, sellers argued the PSAs did not require them to give buyers access to the Yardi software. Sellers argued Snowdon's email in which he stated he did not want to share certain items was insufficient to raise a triable issue of fact as to buyers' claims for breach of contract or fraud arising from the failure to provide access to Yardi as: (1) buyers did not properly authenticate the email; and (2) since buyers opted not to depose Snowdon, one could only speculate as to what he intended.

Finally, sellers argued as a non-contracting party to the PSAs, Highridge was not a proper defendant in the case and buyers failed to present any admissible evidence to the contrary.

### The Summary Judgment Hearing

At the hearing on the summary judgment motion, the trial court first announced its tentative decision to grant the motion. Regarding the fraud and negligent misrepresentation claims, the trial court noted buyers claimed the fraud consisted of providing false financial information during the due diligence period by altering the information to remove expenditures to make the properties look more profitable. The trial court found there was no evidence sellers provided false figures for operating and maintenance expenses or administrative expenses in the April 2016 Forest View financial

---

[5] Sellers provided lists of the invoices that buyers submitted with their opposition.

14.

statement, as sellers demonstrated the expenses buyers claimed were missing appeared in documents under different categories, so the numbers came out the same.

As for sellers' failure to notify buyers of the existence of unpaid invoices, the trial court found there was no evidence that resulted in the communication of false information, as there was no evidence sellers buried or intentionally concealed the invoices and the mere existence of the invoices did not establish concealment. The trial court sustained sellers' objection to admission of the unpaid invoices in Exhibit E to the buyers' attorney's declaration on the ground they were not properly authenticated but overruled their objection to the exhibits produced by the parties in discovery on the ground they were party admissions.

With respect to the data-sync issue, the trial court found there was no evidence of a conflict between the data in the Yardi system and the materials sellers provided buyers during the due diligence period. The trial court did not believe Snowdon's email created a triable issue of fact because buyers "were merely speculating about the factual context and what he meant about a possible conflict and not wanting to share unspecified information." The trial court found buyers failed to establish sellers concealed information or that Highridge changed data.

On the breach of contract claim, the trial court noted the claimed breaches were providing false information in due diligence and refusing to act reasonably with the data sync, which involved the same analysis as the fraud and negligent misrepresentation claims. The trial court added there was no evidence access to Yardi was requested before closing, as the emails at best suggested the request was made on the date of closing, and there was no evidence sellers should have provided access to Yardi before the close of escrow in the absence of a specific request.

The trial court entertained argument on its tentative ruling. Buyers' attorney argued they had shown a "fraudulent disappearance of expenses that has the same effect on net operating income as a fraudulent appearance of income that doesn't exist." The

15.

attorney asserted it was undisputed the unpaid invoices were not captured in the income statements provided to buyers and complained buyers did not have a chance to rebut sellers' assertion the expenses were reallocated. The attorney further asserted the difference in expenses between the Winn-provided statement and seller-provided statement created a factual issue as to intent.

The trial court responded it checked the math on the operating and maintenance expenses and administrative expenses and the numbers were all accounted for, they were just differently categorized; therefore, buyers could not be damaged. The trial court asked if buyers were talking about something other than those expenses. At first, buyers' attorney responded yes, but when the trial court stated it needed to rule based on what was in front of it, buyers' attorney stated it was in the papers. The attorney explained there were two avenues: (1) changing the numbers; and (2) expenses that were never docketed. The attorney asked to be allowed to submit a supplemental brief regarding sellers' claim the expenses were categorized differently, but even if the expenses were recategorized, sellers admitted the unpaid invoices had never been docketed.

Sellers' counsel objected to allowing buyers to submit briefing on recategorization of the expenses, asserting the request was too late, the trial court was correct in its analysis, and sellers did not submit any new evidence with their reply. Counsel submitted the only material issue was whether the income statements produced in due diligence were inaccurate and there was no evidence there was anything inaccurate in the information provided. Counsel asserted that even if buyers were given an opportunity to respond, they would try to confuse the issue and "redo the math, but the math is the math." Counsel argued the missing invoices should be excluded because they were not properly authenticated, but, in any event, nearly all the invoices were dated after the due diligence period so they would not have been reflected in any of the documents provided in due diligence. Counsel further argued the buyers knew the properties continued to operate between the end of the due diligence period and when the deal closed, the PSAs

16.

did not obligate sellers to provide invoices or additional information, and there was no evidence sellers did not pay the invoices.

The trial court asked sellers' counsel to address whether buyers' undisputed facts concerning the unpaid invoices contradicted the tentative ruling.[6] Counsel responded sellers did not dispute the invoices existed and were not provided to buyers, but they postdated the due diligence period, so the argument they were hidden or concealed did not make any sense, and sellers did not have a contractual obligation to provide them.

After hearing argument, the trial court announced the tentative ruling would stand and denied the request to allow additional briefing in response to the reply, as the time had passed. Buyers' attorney then asked to make a point and asserted the invoices in Exhibits E and F were not encapsulated in the financial statements, stating: "There's an invoice dated April 4th, 2016 for $1475 on the 103rd page of the declaration of Exhibit E. There's an invoice dated 8-25-2016, Page 119 of the declaration. $855 in Exhibit F, for example, there's—it's No. 1238 dated 8-9-2016, so the notion that this is, oh, don't worry, this is all just after the parties entered the contract, it's not true." The trial court asked if those numbers would "be material," adding "[t]hey don't sound material in a million dollar deal." Buyers' attorney thought they were, adding there were other dimensions of damages he could go through. The trial court, however, stated it was familiar with how damages were calculated in these matters, and it heard all it needed to.

---

**6** The trial court referred to fact Nos. 35 and 36 in buyers' additional undisputed material facts. Fact No. 35 stated: "After the December 22, 2016 closing, Plaintiffs received calls from vendors pertaining to what ended up being $27,854.93 in unpaid pre-closing Property expenses pertaining to 36 unpaid invoices. [¶] Chase Decl., Ex. E (Invoices)." Fact No. 36 stated: "After the December 22, 2016 closing, Winn located an additional $10,768.69 in unpaid pre-closing Property expenses pertaining to 22 additional unpaid invoices. [¶] Chase Decl., Ex. F (Invoices found by Winn) at WINN_0000700, WINN_0001233-0001256." Sellers responded to these facts as follows: "Undisputed for purposes of this motion, but the evidence submitted lacks foundation and proper authentication and does not support the fact alleged in this paragraph."

17.

The trial court stated, "[t]he tentative ruling stands," and directed sellers to prepare the order.

The trial court subsequently signed and filed the written order granting the motion. The written order stated that as to the first through third causes of action for breach of contract against Oak Hills LP, Columbia Village LP, and Forest View LP, buyers alleged sellers breached the PSAs by providing false information during the due diligence period, but the evidence buyers submitted in opposition to the motion did not demonstrate that any false information was provided, or that sellers otherwise breached their contractual obligations. As for the fifth and sixth causes of action for fraud and deceit, and negligent misrepresentation, the order stated buyers alleged sellers presented them with false financial information during the due diligence period and the material provided had been altered to remove expenditures to make the properties look more profitable. The order explained sellers' evidence did not demonstrate any false information was provided or that sellers committed any other acts of fraud and deceit, or negligent misrepresentation.

The order stated the trial court's determination was based on the following additional findings: (1) buyers' proffered evidence of the alleged discrepancies in the expenses incurred at the properties produced in due diligence did not demonstrate there was false or fraudulent information, as the cited discrepancies were in actuality just a matter of different formatting, but with substantially the same total amount of expenses shown; and (2) the invoices allegedly omitted in due diligence, attached as Exhibit E, were inadmissible since the trial court sustained sellers' objection, and even if considered by the court, did not demonstrate false information was provided in the due diligence process.

Judgment subsequently was entered on October 23, 2020, in sellers' favor.

18.

## DISCUSSION

*Standard of Review*

On appeal, buyers make numerous arguments challenging the trial court's analysis and rationale. The trial court, they assert, improperly weighed the sufficiency of the evidence, failed to construe the evidence in the light most favorable to them, and failed to make reasonable inferences or consider circumstantial evidence. For example, buyers assert because the trial court commented the dollar amount of certain unpaid invoices did not "sound material in a million dollar deal," the trial court engaged "in impermissible evidence-weighing." Buyers emphasize the use of the word "material" to support their argument the trial court improperly weighed the sufficiency of the evidence and failed to construe the evidence in a light most favorable to them.

These issues concerning the trial court's view of the evidence and its rationale are resolved by our standard of review. "In evaluating the propriety of a grant of summary judgment our review is de novo, and we independently review the record before the trial court." (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925.) We may affirm the judgment "on any correct legal theory, provided the opposing party had the opportunity to address it below." (*Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 821.) Because we review the trial court's "ruling, and not its rationale," we are not bound by the trial court's stated reasons for granting summary judgment. (*Citizens for Odor Nuisance Abatement v. City of San Diego* (2017) 8 Cal.App.5th 350, 358.) Therefore, we need not express any view as to the correctness of the trial court's reasoning.[7]

---

[7] Buyers contend we are required to pay attention to the trial court's stated reasons in reaching its decision, citing *Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2015) 238 Cal.App.4th 513, 519–520. That case is inapplicable here, however, as it involves review of an attorney fee award under an abuse of discretion standard, not de novo review of a summary judgment motion.

"In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Zavala v. Arce*, *supra*, 58 Cal.App.4th at p. 925.) Under these rules and standards, summary judgment is proper where no triable issue of material fact exists, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "A defendant may establish its right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action. [Citation.] A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Neiman v. Leo A. Daly Co*. (2012) 210 Cal.App.4th 962, 967.)

In reviewing a summary judgment motion, "we must consider all of the evidence and all of the inferences reasonably drawn therefrom, and we must view such evidence in the light most favorable to the opposing party." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.) This means we accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385.) "A material issue of fact may not be resolved based on inferences, if contradicted by other inferences or evidence." (*Alexander v. Codemasters Group Limited*, at p. 139.) " '[T]he court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact,' but must determine the question of law of 'what any evidence or inference *could show or imply to a reasonable trier of fact.*' " (*Ibid.*)

While summary judgment was granted on all of buyers' claims, on appeal buyers only challenge the breach of contract claims. Buyers contend they presented three specific items of evidence that established a triable issue of material fact as to whether sellers breached the PSAs. We address these items below and based upon our independent review of the record, we conclude summary judgment was proper.

*Breach of Contract*

Buyers contend they created a triable issue of fact over whether sellers deliberately underreported property operating expenses to fraudulently boost the properties' sales prices in breach of the PSAs. Specifically, they assert they showed that sellers underreported expenses during the due diligence period, in breach of paragraphs 3(a)(iv)(1)(A) and 9(b)(ii) of the PSAs, as evidenced by: (1) the failure to include an August 9, 2016, invoice for pool supplies, which totaled $32.25, in the properties' income statements; and (2) Snowdon's email in which he states: "They don't need all of this, as some might conflict with what was given in due diligence." Buyers also assert, for the first time on appeal, that sellers breached paragraph 9(b)(iv) of the PSAs by failing to list a service contract for rubbish removal in Exhibit G of Forest View's PSA.

We begin with the invoice. In moving for summary judgment on buyers' allegation that sellers failed to disclose the existence of unpaid invoices, sellers argued buyers could not prove damages because the invoices buyers claimed sellers were obligated to pay, which sellers attached as an exhibit, either were directed at buyers or were not sellers' responsibility because they were for services rendered after the closing date. In their opposition, buyers disputed the invoices sellers produced with their motion were the only ones, asserting Winn produced an additional 22 invoices during discovery that showed $10,768.69 in unpaid preclosing property expenses, which were labeled Exhibit F to buyers' attorney's declaration.[8] Buyers argued sellers had not reconciled

---

[8] While buyers also asserted that after the closing date, they received calls from vendors pertaining to $27,854.93 in unpaid preclosing property expenses as reflected in

21.

how these "actual expenses went missing" and failed to inform them of outstanding invoices at the time of closing. In reply, sellers argued the PSAs did not require them to provide the invoices to buyers or to pay them by the closing date. Sellers noted virtually all the invoices were dated after September 30, 2016, and therefore would not have been provided to buyers or reflected in the financial statements provided in due diligence. Finally, sellers argued there was no evidence buyers were damaged by the allegedly unpaid invoices.

At oral argument, buyers' attorney asserted the expenses reflected by the invoices in Exhibit F were "not captured in the income statements" and were "not shown in the materials that were provided to … buyers." He further asserted it was "undisputed that they weren't in the income statements." On this issue, sellers' counsel responded that "nearly all of them—there may be one or two exceptions—were invoices that were dated after the due diligence period" so they would not be reflected in the statements or documentation provided to buyers in due diligence, and there was no evidence sellers did not ultimately pay the invoices. Buyers' attorney then pointed out there was an August 9, 2016, invoice in Exhibit F that existed before the parties entered into the contract.

It is this last invoice that buyers contend creates an issue of fact, as they appear to concede the remaining invoices in Exhibit F postdated the due diligence period. The invoice, dated August 9, 2016, is for $30 in pool supplies, specifically liquid chlorine, plus $2.25 in tax. The document reflecting the invoice appears to show an attempt was made to pay the $32.25 due on December 13, 2016, but for some reason the check, which was paid to Foothill Fire Protection Inc., was not issued until January 2017. Buyers assert this invoice creates a factual dispute as to whether sellers accurately provided them

36 invoices, which were attached as Exhibit E to the buyers' attorney's declaration, the trial court sustained sellers' objection to these invoices on the ground they were improperly authenticated. Buyers do not contest this ruling on appeal.

with all their currently binding legal obligations and therefore breached paragraphs 9(b)(ii) and 3(a)(iv)(1)(A) of the PSAs.

The failure to disclose this one invoice before closing, however, did not violate either identified paragraph of the PSAs. By its terms, paragraph 9(b)(ii) applies to the "Agreement and all documents executed by Seller in connection with this Agreement which are to be delivered to Buyer at Closing …." But there is nothing in the PSAs that require unpaid invoices to be delivered to the buyers at closing or even as part of the due diligence materials. Moreover, there is nothing to suggest sellers asserted the unpaid invoice was not their "legal, valid and binding obligation[]," as set forth in paragraph 9(b)(ii), as the document reflecting the invoice shows that sellers ultimately paid it.

Paragraph 3(a)(iv)(1)(A) provides that "all of Seller's representations and warranties contained in this Agreement shall be true and correct in all *material* respects as of the Closing …." (Italics added.) Buyers, however, do not identify what representation or warranty sellers made that was untrue or incorrect due to the failure to disclose this invoice. To the extent they are claiming sellers made an untrue or incorrect representation because the expense reflected in the invoice was omitted from the financial statements provided during due diligence, the PSAs provided that sellers would have no liability for "the content or accuracy" of the due diligence materials.

Moreover, buyers did not present any evidence to show the invoice amount was omitted from the financial statements and, contrary to buyers' attorney's representations at the summary judgment motion hearing, sellers never conceded it was not included. While buyers assert it was not their burden to show this and it was sufficient to produce the invoice to create a factual issue, we disagree because the mere existence of the invoice does not show the amount reflected in it was not included in the financial statements of one of the properties. As we have stated, a triable issue of fact only exists "when the evidence reasonably permits the trier of fact, under the applicable standard of proof, to find the purportedly contested fact in favor of the party opposing the motion."

23.

(*Alexander v. Codemasters Group Limited*, *supra*, 104 Cal.App.4th at p. 139.) Here, the invoice does not reasonably permit a trier of fact to find it was not included in the financial statements and therefore its nondisclosure constituted a breach of contract.

Buyers contend Snowdon's postclosing email statement, which he made when determining what information to provide buyers for use in the Yardi system, that they "don't need all of this, as some might conflict with what was given in due diligence," is circumstantial evidence that reasonably supports an inference the property expenses provided during due diligence were false or incomplete. Buyers assert Snowdon's statement "reasonably suggests Highridge's own belief that the Property expenses it reported earlier were false and or incomplete when compared to the financial information it had on-hand," and "[b]y making the considered decision to not disclose that information because it 'might conflict' with the true state of affairs, Mr. Snowdon clearly believed the information was material and, if known to ARA, would impact the price or even jeopardize the entire deal." Buyers contend the email therefore created a triable issue of fact as to whether sellers breached paragraphs 9(b)(ii) and 3(a)(iv)(1)(A) of the PSAs.

An inference that sellers provided false or incomplete information concerning property expenses during due diligence from Snowdon's email statement that some information "might conflict with what was given in due diligence" is clearly speculative. Speculative inferences derived from evidence, such as a declarant's words, " 'cannot be deemed to be relevant to establish the speculatively inferred fact ….' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 681–682; *People v. Hovarter* (2008) 44 Cal.4th 983, 1009.) To infer from Snowdon's statement that false or incomplete information concerning property expenses was provided during due diligence requires us to speculate as to why he thought the information "might conflict" with the due diligence materials, whether that potential conflict concerned property expenses, and whether there was an actual conflict between the two sets of information. Moreover, it is speculative to infer

24.

from Snowdon's statement that any conflict between the two sets of information would have impacted the sales price to buyers' detriment.

Buyers' reliance on *Zipusch v. LA Workout, Inc.* (2007) 155 Cal.App.4th 1281 is misplaced. There, the appellate court held the plaintiff in a premises liability negligence action raised a triable issue of material fact regarding whether the defendant negligently inspected and maintained its exercise equipment based on her observations the equipment was not inspected in the 85-minute period before her accident, and a reasonable argument could be made that an 85-minute period between inspections was unreasonably long. (*Id.* at p. 1293.) In contrast here, Snowdon's statement simply cannot be used to reasonably infer sellers provided false or incorrect property expenses during due diligence.

Finally, buyers claim the trial court "overlooked" a triable issue of material fact regarding the underreporting of service contracts in violation of paragraph 9(b)(iv) of the PSAs, which states: "To Seller's actual knowledge, Exhibit G is a complete list of all Service Agreements affecting the Property as of the Effective Date." In arguing in their reply brief that Forest View did not have any missing expenses because they were recategorized, sellers pointed out the expense "Rubbish Removal" in the Winn-provided statement was recategorized under "Service Contracts" in the statement provided during due diligence. Buyers argue that because sellers failed to include rubbish removal in the list of service agreements in Exhibit G to Forest View's PSA, Forest View breached paragraph 9(b)(iv), thereby causing buyers to incur additional costs for the service contract.

The trial court, however, did not overlook this argument because buyers never made it below. "The appellate court can deem an argument raised in an appeal from a grant of summary judgment waived if it was not raised below and requires consideration of new factual questions." (*Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488; accord, *City of San Diego v. Rider* (1996) 47 Cal.App.4th 1473, 1493 [new theory on appeal is waived "when the new theory

25.

involves a controverted factual situation not put in issue below"]; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 983 [generally "a new theory may not be presented for the first time on appeal unless it raises only a question of law and can be decided based on undisputed facts"].)

Here, buyers claim that Forest View breached its PSA because it did not include "rubbish removal" in its list of service agreements in Exhibit G to the PSA necessarily involves consideration of new factual questions. Sellers assert rubbish removal was not required to be listed in Exhibit G because no rubbish removal contract existed, and had buyers raised the issue below, they would have explained no formal service contract for rubbish removal was required at any of the properties. Because this issue requires consideration of new factual issues, buyers' failure to raise it below results in its waiver.

Buyers assert they were unable to raise this issue below because it was prompted by the argument sellers made in their reply brief that the expenses had been recategorized; the trial court did not permit them to file a supplemental brief to address the issue; and the trial court ended oral argument before buyers' attorney could explain the unique breach and damages the miscategorization of costs caused. But it was clear from the Forest View financial statement, which buyers were provided during due diligence, that "Rubbish Removal" was included under the expense category "CONTRACT SERVICES," and was clear from Exhibit G to the Forest View PSA that rubbish removal was not included in the list of "SERVICE AGREEMENTS." Thus, buyers knew or should have known of this fact prior to sellers' reply brief and if they believed this constituted a breach of contract, they should have included it in their complaint and at least raised it as a factual issue that precluded summary judgment on the breach of contract claim. Their failure to do so waives the argument on appeal.

26.

In sum, because buyers failed to raise a triable issue of material fact with respect to their breach of contract claims, the trial court did not err in granting sellers' summary judgment motion.

## **DISPOSITION**

The judgment is affirmed. Costs on appeal are awarded to respondents.

DE SANTOS, J.

WE CONCUR:

POOCHIGIAN, ACTING P. J.

SMITH, J.

27.